**The CITY OF NEW YORK,**
Plaintiff–Appellee,

v.

**Donna E. SHALALA, as Secretary of the United States Department of Health and Human Services; United States Department of Health and Human Services,** Defendants–Appellants.

**No. 861, Docket 93–6069.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 25, 1994.

Decided Sept. 13, 1994.

---

Sara L. Shudofsky, Ass't U.S. Atty., New York City (Mary Jo White, U.S. Atty. for the S.D. of N.Y., Ping C. Moy, Ass't U.S. Atty., of counsel), for defendants-appellants.

Michael S. Adler, New York City (O. Peter Sherwood, Corp. Counsel of the City of N.Y., Francis F. Caputo, of counsel), for plaintiffs-appellees.

Before: WALKER and JACOBS, Circuit Judges, and DALY, District Judge.*

WALKER, Circuit Judge:

Defendants Donna E. Shalala (the "Secretary") and the United States Department of Health and Human Services ("HHS") appeal from a judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, *Judge*), granting summary judgment to plaintiff the City of New York in a suit challenging HHS's decision to disallow approximately $3 million in

---

* The Honorable T.F. Gilroy Daly, United States District Judge for the District of Connecticut, sitting by designation.

Head Start funds formerly allocated to the City and to assess $1.7 million in interest. We reverse in part, vacate in part, and remand.

## BACKGROUND

This action stems from grants issued under the federally funded Head Start program by the Office of Human Development Services ("OHDS"), an agency of HHS, to the City of New York, specifically its Human Resources Administration Agency for Child Development (collectively "the City"). The Head Start program is aimed at delivering "comprehensive health, educational, nutritional, social, and other services to economically disadvantaged children and their families." 42 U.S.C. § 9831(a). As a "grantee" of the program, the City provides funds to "subgrantees" or "delegate agencies," which are non-profit entities that actually run Head Start programs. *See* 42 U.S.C. § 9837; 45 C.F.R. §§ 74.3, 1301.2. The City dispenses funds to sixty or more delegate agencies each year.

The City receives an annual grant from OHDS at the start of each program year. Program years run from February 1 of one year to January 31 of the next year. Relevant to this appeal are program years running from 1976 to 1991. OHDS assigns the letter K to the program year ending on January 31, 1977; L, M, N, and O denote the next four years. P and 16 are used interchangeably to denote the year ending January 31, 1982. The following years are designated solely by number, beginning with 17. After receiving its yearly grant, the City makes monthly disbursements to delegate agencies based on its review of those agencies' expense projections and reports of prior expenditures.

The City is responsible for ensuring that Head Start funds allocated to it are expended and accounted for in a manner consistent with the program's objectives. At the completion of each program year, the City submits audit reports to OHDS pertaining to the City's receipt and disbursement of Head Start funds. OHDS reviews these audits to determine whether they include any disallowable expenditures. In order to be allowable, costs must be necessary and reasonable for the proper and efficient administration of the grant program. If OHDS determines that an audit is proper in all respects, it sends the City a letter stating that the audit is closed. If OHDS concludes that the City received funds in excess of the amount to which it is finally determined to be entitled, the City must return the disallowed funds to OHDS. If dissatisfied with such a finding by OHDS, the City can appeal OHDS's decision to the Department of Health and Human Services Departmental Appeals Board ("DAB"). *See* 42 U.S.C. § 1316(d); 45 C.F.R. Part 16, App. A, § C (delegating Secretary's authority to reconsider disallowances of grant funds to the DAB).

This case centers on disallowances that OHDS made with regard to the City's audits for program year ("PY") 16 and PY 19, which ended in 1982 and 1985 respectively. For PY 16, OHDS disallowed an "accounts receivable" balance which had existed for a substantial period of time on the books of the City. The "accounts receivable" balance represented that amount of federal cash drawn down by the City from its grant allowance and advanced to various agencies in excess of allowable Head Start costs incurred by the delegate agencies. It increased from one program year to the next as the City accumulated the delegate agencies' old debts and added on new ones. For PY 19, OHDS again disallowed the City's accounts receivable balance and, in addition, disallowed an "accounts payable" balance. The "accounts payable" balance represented federal cash that was drawn down by the City to pay delegate agencies but never actually disbursed to these agencies to cover their reported expenditures. Like the accounts receivable, this balance also increased over time as the City accumulated new obligations to pay delegate agencies without satisfying its old ones.

The accounts receivable balance appeared in the City's audit reports at least as early as PY K and continued to appear in the audits for PY L and PY M. The audits for these three years were closed in August 1982. By letter dated October 19, 1982, OHDS asked for information on the status of the accounts receivable and accounts payable noted in the audit report for PY N. This precipitated extensive correspondence between OHDS

and the City regarding the latter's efforts to liquidate the accounts. In a February 13, 1984 letter, OHDS informed the City that the PY N audit would be closed "contingent on liquidation of outstanding account receivables" due from delegate agencies; the PY N audit was subsequently closed in May 1984. The audit report for PY O again revealed outstanding accounts receivable, which again led to correspondence between OHDS and the City regarding the City's collection efforts. In closing the PY O audit on August 1, 1984, OHDS stated that the accounts receivable remained unresolved and would be reviewed as part of the audit for PY P (16).

On August 21, 1984, OHDS advised the City that it was disallowing $620,622 in accounts receivable from PY 16. The City appealed to the DAB. The DAB affirmed the disallowance on the basis that the accounts receivable "represent federal grant funds that have not been demonstrated to have been used for allowable program expenditures by the delegate agencies and ... may no longer even be collectible from the delegate agencies." *New York City Human Resources Admin.*, DAB Decision No. 720, Docket No. 84–206 (Jan. 30, 1986). HHS nevertheless agreed to suspend enforcement of this decision pending the outcome of proceedings, by then underway, regarding PY 19.

The City's audit reports for PY 17 and PY 18 continued to indicate that there were outstanding accounts receivable due from delegate agencies and also showed accumulated accounts payable. OHDS and the City corresponded in detail about the status of these accounts, with OHDS repeatedly requesting documentation from the City evidencing that it had liquidated both accounts. The audits for PY 17 and PY 18 were respectively closed in August and June 1986.

At the close of the PY 19 audit review, on September 15, 1987, OHDS informed the City that it was disallowing $901,639 in accounts receivable and $1,541,362 in accounts payable. The accounts receivable figure represented the total amount due from delegate agencies for PY K through PY 17 ($1,522,261) reduced by the amount previously disallowed from PY 16 ($620,622). The accounts

payable figure reflected obligations owed by the City to delegate agencies from PY K through PY 18. The City appealed these disallowances to the DAB, which affirmed them in full. *New York City Human Resources Admin.*, DAB Decision No. 1199, Docket No. 87–184 (Oct. 4, 1990). The DAB found that the accounts receivable were uncollectible given the age of the balances, and that the accounts payable no longer represented legitimate program obligations. The DAB rejected the City's argument that it had reduced both accounts nearly to zero by offsetting them against each other.

In November 1990, HHS demanded payment from the City of the disallowed amounts from PY 16 and PY 19, plus interest, and subsequently offset this amount of approximately $4.7 million against the City's Head Start grant for PY 26. The City filed the instant action in April 1991, alleging that HHS's disallowances, as affirmed by the DAB, violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* In January 1993, the district court awarded summary judgment to the City on the basis that HHS's disallowance of the accounts in question was inconsistent with its previous acceptance of the City's audit reports. The district court further held that even if the disallowances were proper, HHS was not entitled to recover interest. HHS now appeals.

## DISCUSSION

■ On appeal from a grant of summary judgment on an APA claim, we review the administrative record *de novo* and render our own independent judgment, according no deference to the district court's decision. *Ward v. Brown*, 22 F.3d 516, 521 (2d Cir.1994).

■ The City argues that HHS's disallowances should be set aside under the APA because they are arbitrary and capricious and in excess of HHS's statutory jurisdiction, authority, or limitations. *See* 5 U.S.C. §§ 706(2)(A) and (C). However, the district court found, and the parties do not dispute, that the statutes that provide for HHS to appropriate and administer funds for the Head Start program, 42 U.S.C. § 9831 *et seq.*, do not address the specific question of

whether HHS may disallow a grantee's accumulated accounts receivable and payable on the basis of their age and lack of supporting documentation. Rather, the statutes invest the Secretary with the broad authority to audit and examine the records of any agency receiving financial assistance under the Head Start program and to prescribe rules or regulations necessary for the execution of the program, including rules regarding recipients' record-keeping. *See* 42 U.S.C. §§ 9839, 9842. Because of HHS's broad discretion in this area, and the fact that Congress did not speak to the issues under review, the City's argument that HHS has acted in excess of its statutory authority is without merit. This does not end our concern, however, because the conduct of an agency acting within the parameters of its authority may still be invalid as arbitrary and capricious.

■ Our analysis is thus confined to whether HHS has violated § 706(2)(A). The scope of review under this provision of the APA is "a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). In reviewing the agency's explanation of its actions, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (internal quotations and citations omitted). An agency action would be set aside under this standard "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* However, "[t]he court is not empowered to substitute its judgment for that of the agency." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. With these principles in mind, we turn to the agency's disallowances from the two fiscal years in question.

*I. The Disallowance from PY 16*

OHDS disallowed the accounts receivable from PY 16 because the City failed to liquidate the accounts despite being given multiple opportunities to do so. OHDS took the position that the accounts were too old to be considered collectible and must therefore be reimbursed to OHDS out of the City's own funds, rather than being carried indefinitely on the City's books. In hearings before the DAB, the City did not respond by showing the continuing validity of the accounts receivable, but rather argued (1) that the accounts receivable constituted only money due to the City, not to OHDS, and (2) that the accounts receivable had been offset by delegate agency expenditures, payments, and accounts payable.

■ We do not believe that the DAB acted arbitrarily or capriciously in rejecting both of the City's claims. By listing an entry on its books as an "account receivable," the City acknowledged that the entry represented funds forwarded to delegate agencies in excess of their allowable program expenditures that resulted in debts owed by the delegate agencies to the City. These debts were, in turn, owed by the City to OHDS, because they reflected grant funds that had been drawn down from the City's federal letter of credit yet not expended for program purposes. The City's failure to recoup these funds or otherwise justify that they had been expended for allowable purposes entitled OHDS to demand repayment under 45 C.F.R. § 74.112(a), which requires grantees to repay "[a]ny grant funds paid to the grantee by the Federal Government in excess of the amount to which the grantee is finally determined to be entitled under the terms of the grant." The fact that the City originally advanced monies to delegate agencies from a City account which was later covered by federal grant funds does not alter the calculus. Once the federal money was drawn down, the City became responsible for justifying its use.

■ As for the City's contention that the amounts were properly offset, the DAB reasonably rejected the argument on the basis that its sole support was documentation generated by City employees that had not been

verified by independent auditors. HHS regulations require that grant funds be accounted for on the basis of verified financial statements produced by independent auditors. *See* 45 C.F.R. § 1301.12(a). The DAB's refusal to consider the City's documentation of the purported offsets without its having been independently examined and verified is thus wholly consistent with the regulations that pertain to the Head Start program.

While acknowledging that the OHDS had a valid interest in collecting monies not properly spent on program costs and, in general, the right to do so, the district court nonetheless held that HHS improperly disallowed the accounts receivable balance. The district court reasoned that HHS's disallowance represented an unjustified departure from its previous practice of "accepting" the City's accounts receivable balance by closing audits that included this balance in its ledger. We disagree with this basis for foreclosing the disallowance.

■ By closing out an audit that included an accounts receivable balance, OHDS did nothing more than accept the City's designation that these funds still needed to be accounted for. The City could subsequently account for this balance either by documentation indicating that the funds had been allocated to allowable expenditures or by repayment. Thus, the effect of closing out an audit with an accounts receivable balance was only OHDS's permission to the City to carry its accounting obligation to the following year, not the cancellation of the City's obligation to account for the funds altogether. Indeed, OHDS periodically informed the City beginning in October 1982 that the accounts receivable balance needed to be liquidated or otherwise accounted for. Despite these warnings, the City carried the accounts receivable balance from one year to the next, adding to it the receivables from each successive year. Given these circumstances, we think OHDS acted reasonably in deciding that, after a certain period of time, the City was no longer entitled to postpone its accounting obligations.

■ The district court's interpretation of OHDS's initial acquiescence to the ongoing maintenance of the accounts receivable bal-

ance as an agency rule estopping it from demanding a future accounting is without support in the law of this circuit. "[T]he principle of equitable estoppel is not applied to the Government on the same terms as it is to private citizens." *United States v. Boccanfuso,* 882 F.2d 666, 669 (2d Cir.1989). We apply estoppel to the Government only in those limited cases where the party can establish both that the Government made a misrepresentation upon which the party reasonably and detrimentally relied and that the Government engaged in affirmative misconduct. *See Azizi v. Thornburgh,* 908 F.2d 1130, 1136 (2d Cir.1990); *Boccanfuso,* 882 F.2d at 670–671; *Scime v. Bowen,* 822 F.2d 7, 9 n. 2 (2d Cir.1987); *see also Schweiker v. Hansen,* 450 U.S. 785, 788–90, 101 S.Ct. 1468, 1470–72, 67 L.Ed.2d 685 (1981) (per curiam) (suggesting that party invoking estoppel against Government would have to show, at a minimum, affirmative misconduct). Here, there is no basis for concluding that OHDS intended, by closing the City's audits, to relieve the City of its obligation to use Head Start funds in accordance with program purposes; moreover, the City's reliance on any such representation would not have been reasonable. The City could not reasonably expect that its obligation to account for thousands of dollars in federal monies would simply be extinguished because it failed to fulfill its duty to account for the funds in a timely manner. Finally, no evidence suggests that OHDS engaged in affirmative misconduct. We therefore reject the district court's position that OHDS is barred from making the disallowances because of its prior acceptances of the City's audits.

The City presses additional arguments in support of the district court's result. It contends that in making the disallowance, OHDS impermissibly rejected the City's audit reports prepared by its independent auditors in violation of an HHS rule stating that "if independent audits arranged for by recipients meet the requirements prescribed in the OMB Circulars, all Federal agencies must rely on them, and any additional work must build upon the work already done." Discretionary Grants Administration Manual § 11–1(A). The City argues that because its audi-

tors attested to the accuracy of categorizing certain accounts as "accounts receivable," OHDS was bound to accept at face value their designation that these entries reflected valid collectibles.

▅▅▅ We think the City overstates the significance of the auditors' classification of funds as "accounts receivable." This classification did not necessarily signify that the accounts had a substantial possibility of being collected. In fact, the audit report for PY 16 explicitly stated that "[p]rovisions have not been made ... to recoup outstanding receivables.... Furthermore, many receivables have been outstanding for several years, raising serious doubts as to their collectibility." In any event, as part of its oversight responsibilities, OHDS had the authority to determine when funds drawn down by a grantee and listed as accounts receivable for multiple years no longer represented collectible funds given their longevity and the grantee's inability to liquidate them over time. Such a determination reasonably qualifies as "additional work [that builds] upon the work already done." Furthermore, it effectuates an OMB Circular provision stating that "[b]ad debts, including losses, ... arising from uncollectible accounts ... are unallowable." 45 Fed.Reg. 46022, 46027.

▅▅▅ Finally, the City argued in its original brief to this court that the disallowance from PY 16 will lead to a double recovery for HHS because of OHDS's practice of "reprogramming." Through reprogramming, HHS permits a grantee that has not spent a portion of its grant in one year to use the unobligated funds in a subsequent year. The transferred amount is credited to the grantee's account and HHS supplies the grantee with a correspondingly reduced amount of new federal cash. The City argued that because HHS reprogrammed the accounts receivable disallowed from PY 16 and PY 19 into subsequent years, and has continued reprogramming these amounts into subsequent budget years to the present day, HHS could exact a double penalty from the City by disallowing the accounts receivable from a present year while at the same time collecting on a disallowance from a past year.

However, the City conceded in a supplemental brief submitted after oral argument that it can avoid the danger of a double penalty through appropriate accounting methods. Once the City reimburses HHS for disallowed funds from a past program year, the City can make a prior period adjustment to its current budget to reflect this change in circumstances, which will remove from the City's books in the current year that part of the unobligated balance that corresponds to the invalidated accounts receivable. This accounting adjustment will preclude HHS from making any further disallowance of the questioned accounts and will thereby prevent the possibility of a second recovery.

The City nonetheless argues that utilizing such accounting techniques will cause it to suffer cash flow problems. The City explains that it normally maintains a negative or near negative fund balance and that making a prior period adjustment will further reduce this figure; in other words, it increases the likelihood that HHS will owe the City money and that the sums owed will be large amounts. Because there are no time restrictions regarding when HHS must liquidate the fund balance, the City complains that it will be forced to operate at a deficit until HHS infuses it with further cash. While we recognize that the City may be disadvantaged by having to make a prior period adjustment, that factor does not lead us to invalidate HHS's action. It is not our role to fine-tune the relations between the City and HHS or to determine the best way to resolve their differences. As long as HHS's action is not arbitrary or capricious, it must be upheld.

For the foregoing reasons, we see no basis under § 706(2)(A) of the APA to set aside the DAB's conclusion that the accounts receivable disallowed from PY 16 represent federal funds not accounted for by valid program expenditures which the City is obligated to refund to HHS.

## II. The Disallowance from PY 19

The City also challenges HHS's disallowance of $901,639 in accounts receivable and $1,541,362 in accounts payable from its audit

report for PY 19. We respectively address the City's arguments regarding the accounts receivable, the accounts payable, and its offsetting demonstration.

### A. The Accounts Receivable

The City makes the same arguments regarding the accounts receivable disallowance from PY 19 as it did with PY 16, with the additional complaint that in affirming the disallowance from PY 19, the DAB endorsed OHDS's position that accounts receivable more than two years old represent bad debt. The City argues that the adoption of a two-year rule constitutes the imposition of a new financial standard in violation of 45 C.F.R. § 74.60(b), which provides that "[a]warding parties may not impose on recipients additional financial management standards or requirements concerning non-Federal audits."

 We reject the City's characterization of the DAB's decision. The DAB did not authorize OHDS to utilize a two-year rule regarding bad-debt classification in its dealings with all grantees, or even in all of its dealings with the City. It merely observed that OHDS utilized the two-year measuring period as a method for determining which of the City's delinquent accounts needed to be justified. The City was given the opportunity to produce documentation indicating that these debts were still collectible but failed to do so. The two-year period was thus used by the OHDS as a yardstick to guide its inquiry into the City's improper accounting practices; it was not adopted as an unwavering financial standard newly applicable to all grantees. We otherwise reject the City's arguments as to the accounts receivable disallowance for the same reasons stated in our discussion of PY 16.

### B. The Accounts Payable

The DAB upheld the disallowance of the accounts payable on two grounds: first, that the accounts were long overdue and had not been liquidated by the City; and second, that the City failed to demonstrate that the payables represented valid program expenditures at the point they were first incurred. We agree with the City that the second reason is arbitrary, but nonetheless find the

first to be a rational, independent basis for the agency's decision.

 By requiring the City to demonstrate the validity of the payables with original documentation, DAB contravened agency regulations that require a grantee to retain documents substantiating its audit reports only for three years after the submission of its last expenditure report for a particular program year, or until resolution of "any litigation, claim, negotiation, audit or other action involving the records" that has been started before the expiration of the three-year period, whichever is later. *See* 45 C.F.R. §§ 74.21(a) & (b), 74.22(a). The record demonstrates that although OHDS corresponded with the City in detail regarding the status of both the payables and the receivables, OHDS closed out the audit reports for PY K through PY 18 without disallowing the payables. OHDS argues that the City's record retention duty was nevertheless extended because OHDS's correspondence regarding the payables, which began as early as October 1982, constituted an "action" extending the records retention period until the issue was finally resolved in PY 19. As OHDS concedes, this argument does not encompass program years K, L, and M because they were closed out in August 1982, which was more than three years after the submission of its last applicable expenditure report.

 Even if we accept the argument that OHDS's letters put the City on notice that it should retain records regarding the payables for PY N through PY 18, the City's obligation to retain records for any particular year expired once OHDS closed out the audit for that year or the three-year retention period passed, whichever came later. By closing the audit without making any disallowances, OHDS signalled its acceptance of the validity of the payables; since the closures for PY N through PY 18 occurred after the three-year retention period for each program year had expired, the City was entitled to dispose of its substantiating records immediately. We reject OHDS's argument that its letter actions could indefinitely extend the City's record retention obligations beyond the closure of an audit. The audits for the

relevant years were closed out by letters that made no disallowances and reserved no questions as to payables. Upon receipt of these letters, the City was legitimately entitled to conclude that the payables issues had been resolved and to destroy any substantiating records. It follows that OHDS could not revive an extinguished retention duty by subsequently demanding original documentation for closed out years.

We also reject HHS's argument that by relisting the accounts payable each year, the City retriggered its duty to substantiate the original validity of the entry. Unlike the accounts receivable balance, which represented amounts that the City determined not to have been properly expended for program purposes, the accounts payable balance represented amounts that the City determined were properly expended by delegate agencies and in need of reimbursement. OHDS's closure of an audit signified its acceptance of the entry as representing funds that were properly owed to delegate agencies for proper program expenditures. As such, the City's relisting of the accounts payable in each successive year did not require it to resubstantiate the validity of the entry at point of origin, but only to demonstrate thereafter that the obligations continued to be valid. In fact, this was the position articulated at a hearing before the DAB by the OHDS officer who worked on the City's accounts. The officer stated that OHDS was not questioning the legitimacy of the accounts payable at their inception, but rather the "appropriateness of the obligation" given that "the accounts payable remained open for a long period of time."

If the City's failure to submit point-of-entry documentation for the payables were the sole basis for the HHS disallowance, we would agree with the City that the disallowance could not stand. However, the DAB also premised its disallowance on the City's failure to demonstrate the continuing validity of the accounts payable. Indeed, the primary reason given by the DAB for the payables disallowance was their staleness combined with the City's failure to liquidate the accounts despite being given multiple opportunities to do so. The DAB stated that

"[s]imply due to the age of the balances, the payables do not represent legitimate Head Start program obligations." As an example of the questionable validity of carrying the payables, the DAB noted that "[w]ith regard to the accounts payable, the audit [for PY 19] stated that $107,284 was due to delegate agencies that were no longer in the program." In addition, some of the accounts were over seven years old. Because of the City's persistence in relisting these obligations even though it had long since drawn down the money to liquidate them, the DAB found that OHDS had properly disallowed them, stating that "[s]ince NYC was not entitled to retain federal funds indefinitely to cover the accounts payable, the amount in question was due to be returned to OHDS." We find no clear error of judgment in this decision.

## C. The Offsetting Argument

While we believe the DAB's decision to disallow both the accounts payable and receivable from PY 19 was justified, we think the City raises a meritorious argument regarding the DAB's rejection of the City's claim that it had reduced the accounts receivable balance to $30,828 and the accounts payable balance to zero by offsetting them against each other. The City maintains that offsetting the accounts payable owed to a particular delegate agency against the accounts receivable owed by that same agency is a legitimate way to liquidate its account balances. It reasons that if the delegate agency owes the City $700 in accounts receivable one year, and is owed $700 in accounts payable the following year, the City can offset these obligations against each other and reduce both to zero, rather than forcing the delegate agency actually to transfer $700 to the City for the first year, which the City would then transfer back to satisfy the account payable for the second year. Mindful of the DAB's rejection of its offsetting argument in the PY 16 hearing, the City prepared documentation demonstrating the offsetting that had been examined and verified by independent auditors.

Nevertheless, the DAB still rejected the City's offsetting argument, relying in part on

the City's failure to show that the accounts payable from previous years represented legitimate program obligations at the point they were incurred. However, as we explained above, requiring the City to present point-of-entry documentation for audit years long since closed contravened HHS's document-retention regulations. Accordingly, the City's lack of original documentation was an invalid basis for rejecting its offsetting argument.

The DAB also stated in a footnote that even if the payables represented valid program obligations, offsetting them against receivables was not acceptable because it would prejudice HHS's ability to collect federal funds due to it. However, this conclusion rested on faulty reasoning. The DAB explained its position through a numerical example which presumed that after offsetting, the City would not be obliged to pay HHS monies that it drew down but did not allocate to either accounts payable or accounts receivable. However, there is no indication that offsetting affects that portion of the City's unobligated balance; the City's duty to repay or reuse such unobligated funds remains intact. Because of this erroneous assumption, we think this reason was also an arbitrary basis for rejecting the City's offsetting demonstration.

Finally, we note that OHDS argued that it was impermissible for the City to offset receivables from one year against payables from another year because federal funds are accounted for on a fiscal year basis. The DAB did not rule on this claim because of its finding that the City failed to demonstrate the original validity of the payables. We express no opinion on the merits of this argument. Nor will we rule on HHS's claim presented for the first time on appeal that the City is barred from presenting an offsetting argument because it stated in previous correspondence with OHDS that it did not match accounts from one year with those from another. Given the complex nature of these accounting issues and the deference that courts must show to agencies concerning such affairs as oversight of grant expenditures, we will remand this case to let HHS be the first to consider these arguments. We

hold only that the DAB's prior refusal to consider the City's offsetting argument was not grounded in valid reasoning, and therefore was in contravention of § 706(2)(A) of the APA.

### III. Is HHS Entitled to Interest?

HHS argues that it is entitled to prejudgment interest on sums owed to it by the City. Three months after the district court's decision in this case, the Supreme Court held that although the United States may not assess prejudgment interest against a state or local government under the Debt Collection Act of 1982, 31 U.S.C. §§ 3701(c), 3717, this statute does not abrogate the federal government's right to collect prejudgment interest on debts owed to it by a state or local government under federal common law. *United States v. Texas,* ——— U.S. ———, ——— – ———, 113 S.Ct. 1631, 1635–36, 123 L.Ed.2d 245 (1993). HHS is thus entitled to sue for prejudgment interest under the federal common law; however, the duty to pay prejudgment interest under the common law is not automatic. As noted in *Texas,* the district court must weigh the federal and state interests involved and choose the appropriate rate of interest for a particular case. *Id.* at ——— – ———, 113 S.Ct. at 1635–36; *see also West Virginia v. United States,* 479 U.S. 305, 309–11, 107 S.Ct. 702, 705–07, 93 L.Ed.2d 639 (1987). Since the district court did not undertake this discretionary review, we remand the case for such an assessment insofar as judgment on the PY 16 disallowance is concerned. No such assessment for PY 19 is required since we are returning issues related to that year to the agency for further proceedings.

### CONCLUSION

For the foregoing reasons, we reverse that part of the judgment overturning HHS's disallowance from PY 16 and remand for further proceedings as to HHS's claim for interest, and we vacate that part of the judgment overturning HHS's disallowance from PY 19 and remand for further proceedings consis-

tent with this opinion. Parties should bear their own costs.