**FAIRCHILD HOLDING CORP.,**
Appellant/Cross–Appellee,

v.

**REVERE COPPER AND BRASS,
INC., Appellee/Cross–
Appellant.**

**Nos. 01 Civ.3935(GEL),
01 Civ.3941(GEL).**

United States District Court,
S.D. New York.

Jan. 7, 2003.

---

Colin Lennard, Fulbright & Jaworski L.L.P., Los Angeles, CA (Patricia J. Chen, Fulbright & Jaworski L.L.P, Los Angeles, CA, Felice B. Galant, William J. Rochelle, III, Fulbright & Jaworski L.L.P., New York City, of counsel), for Appellant/Cross–Appellee Fairchild Holding Corp.

Adam P. Strochak, Weil, Gotshal & Manges LLP, Washington, DC (Stephen Karotkin, Weil, Gotshal & Manges LLP, New York City, David R. Berz, John B. O'Loughlin, Jr., Weil, Gotshal & Manges LLP, Washington, DC, of counsel), for Appellee/Cross–Appellant Revere Cooper and Brass, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

Appellant Fairchild Holding Corp. asks this Court to reverse a determination by the Bankruptcy Court that debtor/appellee Revere Copper and Brass Inc. need not reimburse Fairchild for the cost of a hazardous waste cleanup ordered by the California Department of Health Services ("DHS"), and necessitated, in large part, by Revere's operations at a site subsequently sold to Fairchild.[1] The Bankruptcy Court decided that the actions of DHS in requiring a cleanup and adopting a particular Remedial Action Plan were arbitrary and capricious, and disallowed Fairchild's claim. Because the Bankruptcy Court failed to give due deference to the state agency's promulgation and application of standards in a highly technical field, this Court reverses.

## BACKGROUND

The voluminous record in this case involves California administrative proceedings commenced in the early 1980s, a bankruptcy of similar vintage, and evidence of the parties' activities going back half a century. The record includes highly technical materials, and the parties' arguments involve reconstruction of the state and federal administrative regulations, and the underlying scientific and regulatory assumptions, in place approximately twenty years ago – an earlier epoch in the rapidly changing scientific disciplines of environmental science and the equally changeable political and economic discourse of environmental regulation. Distilling and digesting the complex and extensive materials submitted by the parties has been a challenging task, but the resulting story turns out to be a relatively straightforward

---

1. Revere cross-appeals, "solely for the purpose of offering additional grounds ... to support affirmance of the Bankruptcy Court's Order." (Revere Mem. at 1.)

one that can be resolved by the application of basic legal principles.

From 1949 to 1975, Revere operated a mill and factory for the production of brass and copper tubing on a 12–acre site at 6500 East Slauson Avenue in Commerce City, California. The site is located in an area zoned for industrial and manufacturing use. One-half mile to the south, across a railroad track, is the residential community of Bell Gardens. Two schools are located within one mile, and downtown Los Angeles is six miles away. In addition to copper and zinc – the constituents of brass – Revere's process involved the use of a number of toxic substances, including lead. Greer Hydraulics, Inc., Fairchild Holding's predecessor in interest (hereafter referred to simply as "Fairchild"), purchased the site in 1975 and produced hydraulics devices there until 1988. Meanwhile, in October 1982, Revere Copper Products, along with a number of its affiliates, filed petitions under Chapter 11 of the Bankruptcy Code. A reorganization plan was confirmed in July 1985.

A small waste spill at Fairchild's neutralization tank in 1982 prompted the Los Angeles County authorities to require Fairchild to perform soil sampling and submit a cleanup plan. Fairchild's testing indicated the presence of high concentrations of heavy metals, but a compliance plan Fairchild submitted to DHS in 1984 argued that the metals did not threaten the environment or human health and that remediation was therefore unnecessary. DHS disagreed, insisting on a cleanup, and in 1987 Fairchild and DHS entered into a consent agreement, whereby Fairchild would investigate further and take remedial action to clean up the site. The

resulting Remedial Action Plan ("RAP"), prepared by the environmental and geotechnical consulting firm of Dames & Moore on Fairchild's behalf, and accepted with modifications by DHS, confirmed that the site was contaminated with high levels of copper, zinc, and lead. The RAP recommended that approximately 5000 cubic yards of soil be excavated and removed. The RAP also included a nonbinding determination that Revere was 70.5% responsible for the contamination, with Fairchild responsible for the remainder.[2] DHS adopted the RAP, with modifications, in 1989. Fairchild completed the cleanup by mid–1990.

From the beginning, Fairchild has attempted to recover a portion of the cost of the cleanup from Revere, filing in 1983 a timely proof of claim, ultimately amounting to $3.5 million, in the Revere bankruptcy proceedings. DHS, too, sought to hold Revere liable for its contamination of the site, issuing a Remedial Order to Revere at the same time it entered the consent agreement with Fairchild. Revere has responded by steadfastly resisting the DHS determination that any cleanup was necessary. Revere filed comments on the RAP with DHS prior to its approval, asserting that there was no support for DHS's determination that the site posed a risk to public health. After DHS adopted the RAP, Revere challenged it in the California courts – but, for reasons left unclear by the record and the oral argument before this Court, never pursued that challenge to a judgment on the merits. Instead, Revere entered into a stipulation with Fairchild that the California action was moot because the cleanup had been completed,[3]

---

2. Revere, however, was found entirely responsible for the elevated levels of copper found at the site.

3. The history of the California action is intricate. Revere's petition was initially denied as moot, since the cleanup challenged by Revere had been completed by June 1990. Revere

choosing to pursue this essentially environmental-law dispute before the Bankruptcy Court.

The action before the Bankruptcy Court was formally a claim for third-party contribution under § 113 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," the so-called "Superfund" law), 42 U.S.C. § 9613. In such an action, the plaintiff may recover only "necessary" cleanup costs that are consistent with the National Contingency Plan. Costs are "necessary" only if incurred in response to a threat to the public health or the environment. *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669–70 (5th Cir.1989). Here, Fairchild did not unilaterally decide that a cleanup was necessary, and then seek contribution from Revere. Rather, it acquiesced in a ruling by the relevant state regulator, DHS, that a remedy was appropriate. However, costs incurred to implement an "arbitrary and capricious" administrative remedy may not be recovered under CERCLA. *Washington State Dept. of Transp. v. Washington Natural Gas Co., Pacificorp*, 59 F.3d 793, 802 (9th Cir.1995); *In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 904–06 (5th Cir. 1993). Nearly fourteen years after DHS found that a cleanup was necessary, the Bankruptcy Court decided that DHS's conclusion was arbitrary and capricious, and disallowed Fairchild's claim. This outcome, if affirmed, would impose on Fairchild the full cost of a cleanup it had believed it was required to undertake un-

der federal and state law, and which both parties agree was in large part necessitated by Revere's earlier activities. Central to the Bankruptcy Court's ruling was its conclusion that the RAP was based upon a hypothetical threat to public health that bore "no relation to reality": the possibility that a child might daily wander onto the site and ingest the most contaminated soil present there.

## DISCUSSION

### A. Standard of Review

The parties, in order to resolve a dispute about the "proper extent and nature of the [Bankruptcy Court] proceedings on the Claim," stipulated in 1998 that the Bankruptcy Court would determine only whether the decision "as to the necessity for response action ... and the nature of the remedy selected in the [RAP] was 'arbitrary and capricious.' " (App.938.) The Bankruptcy Court accepted this stipulation, which appears to reflect the governing case law cited above.

■ A district court reviews bankruptcy court judgments as the Court of Appeals would review a district court judgment, 28 U.S.C. § 158(c), reviewing findings of fact for clear error and conclusions of law *de novo. In re AroChem Corp.*, 176 F.3d 610, 620 (2d Cir.1999). Upon appeal under the Administrative Procedure Act ("APA") of a lower court's ruling that federal agency action is arbitrary and capricious, the re-

---

moved for reconsideration, arguing that the petition was not moot since DHS had filed a claim against Revere in bankruptcy and had agreed in its consent order with Fairchild to "pursue diligently its efforts to require Revere to accept ... responsibility." Revere's challenge was derailed when DHS found evidence of additional contamination at the site and considered amending the RAP – thus rendering the challenged agency action non-final. The court took Revere's motion off its calen-

dar. DHS never actually amended the RAP, but the motion for reconsideration languished until 1995, when DHS sought and obtained dismissal of Revere's petition for failure to prosecute. Ultimately, in 1996, DHS and Revere entered a stipulation vacating that judgment and dismissing the challenge on the same ground, mootness, upon which the court had first dismissed the action six years earlier.

viewing court accords no deference to the decision of the lower court, reviewing its findings *de novo. Supreme Oil Co. v. Metropolitan Transp. Auth.*, 157 F.3d 148, 151 (2d Cir.1998). Here, where a state agency's finding is challenged, the APA is inapplicable; nevertheless, it seems apparent that where the administrative agency is an arm of a sovereign state government, a reviewing federal court must scrutinize a finding that the agency acted arbitrarily or capriciously at least as carefully as in cases governed by the APA.

B. *Procedural Barriers to Review of DHS's Actions by the Bankruptcy Court*

Notwithstanding its own stipulation that the Bankruptcy Court should decide Revere's liability on the basis of whether the DHS actions were arbitrary or capricious, Fairchild challenges, on several grounds, the propriety of *any* Bankruptcy Court review of those actions.

 The first of those grounds is jurisdictional, and thus must be addressed regardless of the stipulation. Fairchild argues that "judicial review" of the substance of the DHS actions is not available to Revere in Bankruptcy Court or any other federal court. Fairchild is correct that, so long as state law provides adequate mechanisms for review, there is no basis for federal subject-matter jurisdiction over a direct appeal of a state agency decision. *See, e.g., FSK Drug Corp. v. Perales*, 960 F.2d 6, 11 (2d Cir. 1992). Thus, had Revere filed an action in the federal courts seeking to void the DHS action as arbitrary and capricious, Fairchild would prevail on a motion to dismiss. But Revere is not seeking to vacate or reverse the DHS action; that was the remedy it once properly sought in the California Superior Court. Rather, Revere is here arguing as a *defense*

to Fairchild's claim in bankruptcy that Fairchild could and should have itself challenged the DHS actions before it undertook this expensive cleanup, but chose not to. Indeed, Revere's own state court challenge to the RAP was ultimately dismissed as moot essentially because Fairchild chose to cooperate with, rather than join in challenging, DHS. Since the bankruptcy court properly had jurisdiction over the contribution claim, it had jurisdiction to decide any issue, including this one, that was germane to whether Fairchild is entitled to compensation.

Fairchild next argues that Revere should have been barred from challenging the propriety of the DHS actions in bankruptcy court when it had already appealed those actions in the California courts and lost. It might appear that Fairchild's objection, whether based on res judicata, collateral estoppel, or comity, is barred by the stipulation of the parties providing for review of the DHS action under the arbitrary and capricious standard; on first blush, one might think that the stipulation was entered for the very purpose of avoiding these procedural issues. The Bankruptcy Court, perhaps taking that view, never resolved them. However, Revere expressly disclaimed at oral argument any contention that the stipulation waived Fairchild's procedural claims, and the parties further agreed that this Court should resolve these issues, rather than remanding to the Bankruptcy Court to address them in the first instance. (Tr. 13–17.)

 Wholly apart from the stipulation, however, the requirements of res judicata and collateral estoppel are not met, for the California Superior Court never entered a judgment affirming the propriety of the DHS actions. That court dismissed Revere's challenge because it first found, and Revere ultimately stipulated, that Fairchild's completion of the cleanup had ren-

dered the controversy moot as to DHS (which was concerned only that the cleanup take place and not with who paid for it). Thus, for the purposes of both res judicata and collateral estoppel, there was never the required adjudication *on the merits.* *Slater v. Blackwood,* 15 Cal.3d 791, 126 Cal.Rptr. 225, 543 P.2d 593, 594 (1975) (res judicata); *Arasimo Settemo Lucido v. The Superior Court Mendocino Co.,* 51 Cal.3d 335, 272 Cal.Rptr. 767, 795 P.2d 1223, 1225 (1990) (collateral estoppel). And since the California courts never reached a conclusion about the need for a cleanup at the site, there is no decision to which this Court or the Bankruptcy Court should defer in the interests of comity. Thus, there is no obstacle to reaching the merits of Revere's defense.

At the same time, the facts underlying Fairchild's preliminary arguments provide a context for addressing the merits. The deferential "arbitrary and capricious" standard of review was designed to limit the scope of judicial review of agency action, on the assumption that any objecting party will have participated in an administrative decisionmaking process that required the agency to directly address the best arguments that could have been made on behalf of a different outcome. *See Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 133 (2d Cir.2001) (noting that one purpose of requirement that retirement plan's administrative remedies be exhausted prior to bringing suit is to enable judicial review under arbitrary and capricious, as opposed to *de novo,* standard). The standard assumes that the agency has developed a record on the basis of an adversarially-tested proceeding, so that a reviewing court can scrutinize that record and apply what is essentially, as discussed below, a standard of rationality. *See, e.g.,* Administrative Procedure Act, 5 U.S.C. § 706 ("In making the foregoing determination[ ] [that, *inter alia,* agency action

was arbitrary or capricious], the court shall review the whole record or those parts of it cited by a party . . . ."); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("In applying [the arbitrary and capricious] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Here, however, the party that was the direct object of the administrative proceedings made a reasonable decision to cooperate with the agency in developing a negotiated resolution of the action. As a result, the RAP that was presented to and approved by DHS is not supported by the kind of explicit findings of fact and analysis on the part of the agency that might have resulted from a contested proceeding. Moreover, Revere, which initially sought direct review of the cleanup order in the California courts, chose later to acquiesce in the termination of those proceedings while collaterally attacking the agency's decision in the context of Fairchild's claim in bankruptcy – an action to which DHS, having obtained the relief it sought, was never a party.

Because the merits of this dispute were never thrashed out, in any administrative or judicial proceeding, with the participation of the agency, this Court, like the Bankruptcy Court below, must assess the reasonableness of the agency's action without the guidance of its explanation. Under such circumstances, a federal court should be particularly cautious about characterizing and evaluating the administrative action of a sovereign state.

### C. *The Merits of the DHS Cleanup Order*

■ The inquiry before this Court is not whether the cleanup was in fact necessary to protect human health or the environ-

ment, but rather whether the DHS decision in 1987 to require remedial action was arbitrary and capricious – that is, "whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Natural Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 97 (2d Cir.2001) (citation and internal quotation marks omitted). "In evaluating agency reasoning [under the arbitrary and capricious standard], we must be satisfied that the agency examined the relevant data and established a 'rational connection between the facts found and the choice made.'" *Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 89 (2d Cir.2000) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The reviewing court may not "substitute its judgment for that of the agency ... particularly when that determination is propelled by the agency's scientific expertise." *Henley v. Food and Drug Admin.*, 77 F.3d 616, 620 (2d Cir.1996) (citations and internal quotation marks omitted).

Applying the arbitrary and capricious standard here is complicated by the fact that, as the parties agree, the standard is to be applied as of the time the decision was made. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 554–55, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). It appears to be common ground that, due to shifting economic, political, and social conditions and advancing scientific knowledge, the dominant philosophy of environmental regulation has changed in the long years since the decision in question, and the standards commonly utilized by regulators in light of the available knowledge fifteen years ago would likely be regarded as overly cautious today. (Tr. 33–36.) In reviewing the agency decision, the Court must be careful not to rely on information or approaches that might be commonly accepted today but that are inconsistent with the knowledge available or the assumptions that were properly considered reasonable at the time the decisions were made.

The Bankruptcy Court concluded that, judged by this standard, the DHS acted arbitrarily and capriciously in finding, on the basis of the risk assessment submitted by Fairchild's experts, a threat to human health. (Op. at 19.) As the Bankruptcy Court explained,

> The *only* significant health risk identified in the RAP was that a young child might enter the Site and eat contaminated dirt every day for five years. The premise of this risk assessment is that a child aged 1–6 might "wander onto the Site" on a daily basis for five years straight and eat 500 milligrams of dirt from the most contaminated portion of the Site.... [This premise] requires the totally unsupported supposition that a toddler or pre-school age child would, or even could, cross the railroad tracks, walk over one-half mile to the Site, clip the wires or scale the fence surrounding the Site and eat soil from the most contaminated spot on the Site *every single day* of his or her life for five years. There is no evidence whatsoever in the Bankruptcy Record that *any* child had ever entered the Site for any purpose, let alone to eat the contaminated dirt.... To say this scenario bears no relation to reality is an understatement and the court would be hard pressed to come up with a more arbitrary and capricious hypothetical than what Fairchild presented to the DHS.

(Op. at 20–22.)

The Bankruptcy Court, and Revere in this Court, thus undertake to refute the California regulators' conclusion that a

cleanup was necessary by criticizing the standard utilized by DHS (or more accurately, the reasoning presented by environmental consultants retained by Fairchild) to determine whether the contamination of the site produced a risk to human health. The problem with this methodology is that the Bankruptcy Court treats the risk of chronic ingestion by a child of soil from the Revere site as based upon a *finding of fact* that, given the then-present use of the site, young children living elsewhere might enter a fenced industrial site and eat dirt. Had DHS made such a finding it would not have been a scientific or technical determination, and would indeed be amenable to the Bankruptcy Court's analysis based on common sense or "life experience" (Op. at 4), and surely such a scenario would be unlikely in the extreme. But as discussed earlier, DHS did not itself make such a finding, nor did it explain its adoption of the RAP as based on such a scenario. Under these circumstances, this Court may, indeed must, consider alternative analyses, rooted in the factual record, that would justify DHS's approval of Fairchild's RAP before condemning the state's decision as arbitrary or capricious.

Fairchild has provided such an alternative analysis. It suggests that references to the risk posed to human health by possible ingestion of the contaminated soil are more properly characterized as based upon a default regulatory *standard* that took into account the possibility that humans, including children, might at some future date *live* at or near the site. To the extent that a regulator determined that the health risks of contamination of a particular site were to be determined based on the possibility of future residential use (or, put another way, that contaminated sites should be restored to a condition that would be safe for residential use), a party arguing that adoption of such a standard, or the application of that standard in this case, was arbitrary or capricious, would face a much steeper challenge, which could not be resolved by casual empirical assumptions based on common experience.

The record before the Bankruptcy Court does not clearly establish which characterization of the dirt-ingestion scenario DHS was concerned about: the risk of nonresident children wandering onto the site or the possibility of future residential use of the land. The RAP itself does not mention a residential scenario, referring only to "off-site individual[s]." (App.270.) It even acknowledges that access to the site by children was unlikely. (App.273.) Strictly speaking, however, the RAP is not a DHS document; it is a Fairchild document, approved by DHS at a time when both Fairchild and DHS agreed on the necessity of a cleanup. DHS's own manual for hazardous waste cleanups is silent on land use, although one sentence among its nearly 400 pages supports the Bankruptcy Court's analysis by suggesting that only "biological receptors ... presently at risk" need be considered during risk appraisal. California Department of Health Services, *California Site Mitigation Decision Tree Manual,* at 7–2 (1986).

However, there was ample evidence before the Bankruptcy Court that the prevailing practice during the relevant period was to assume the possibility of future residential use. Two experts who had been involved in the preparation of the RAP submitted affidavits affirming this. Schulteis Decl. at 2 (App.1120); Krieger Decl. at 2 (App.1137). The EPA's Superfund Manual, which provided guidance to state agencies such as DHS, directed that "future residential land use" should be "[a]ssume[d] ... if it seems possible." 1 Environmental Protection Agency, *Risk*

*Assessment Guidance for Superfund: Human Health Evaluation Manual (Part A)* 6–7 (Interim Final ed., 1989) ("RAGS Manual") (App.1161). If future residential land use is assumed, a safety standard based on the risk of children ingesting small amounts[4] of contaminated soil would be entirely reasonable. This Court cannot assume that DHS ignored a reasonable basis for finding a future health risk and based its decision instead on a fanciful one.

Revere asserts, however, that the scenario of future residential use, as applied to this particular site, is in any event sufficiently farfetched to render the DHS mandate arbitrary and capricious. But a determination that future residential use of the Revere site was possible would not have been unreasonable. Even where a site was "currently industrial," the EPA instructed that "future residential land use may be a reasonable possibility" if the site "is located near residential areas in an urban area." (*Id.*) This site satisfies those criteria. Fairchild, at the time of the cleanup, had ceased its operations there and thus the future use of the land was undetermined. And there is no evidence in the record of any legal or practical barriers to residential use. It would hardly be arbitrary for a regulator to conclude that it was "possible" that a presently industrial site within a heavily-populated, famously sprawling metropolitan area with intense demand for residential property would at some future point become residential. In any case, projections about land use are best left to local government entities and should not be scrutinized by a federal court a continent away. As Revere itself points, the EPA guidelines insist that "[t]he use of professional judgment . . . is critical" when contemplating deviation from the residential use scenario. *Id.*

Moreover, even accepting arguendo that the probability (from the vantage point of 1989) of the conversion of this industrial site to residential use was small, Revere misunderstands the role of the agency. The agency's task is not to determine whether residential use is likely. Rather, it is to decide upon an appropriate level of cleanup. There are many rational reasons why a state agency might decide in all or virtually all cases to permit contamination levels to remain only when consistent with safe residential use. For example, the agency might be implementing a policy of reducing the need for long-term management of hazardous waste sites, or of freeing up land for unrestricted use, or of conserving its resources by not engaging in efforts to make individualized land use projections. So long as the standard applied by DHS was relevant and not irrational, its decision to apply that standard uniformly cannot be characterized as arbitrary or capricious; indeed, it is *departures* from normal guidelines or procedures that typically trigger heightened judicial scrutiny of an agency's analysis. *See New York Council, Ass'n of Civilian Technicians v. Federal Labor Relations Auth.*, 757 F.2d 502, 510 (2d Cir.1985).

Particularly in a situation where the cleanup order resulted from negotiations between Fairchild and the agency, rather than a formally-litigated procedure leading to findings of fact or conclusions of law, the Bankruptcy Court's decision to seize upon the most easily attacked reading of the evidence, and to assume that DHS's decision was based on a fanciful scenario of children from remote locations straying into an industrial area (Op. at 3 & n. 3), rather than determining whether there was a potential reasonable basis for setting a strict standard of decontamination of the property, inverts the arbitrary and capri-

---

4. 500 milligrams is approximately 1/60 of an ounce.

cious test by failing to give due respect to the administrative agency's expertise, or even its ordinary common sense.

Revere also challenges the DHS determination that the actual concentrations of copper and zinc at the site were sufficient to pose a risk even if children had daily access to the site, and the adoption by DHS of the relatively expensive remedy of excavation and removal of the contaminated soil. The Bankruptcy Court, having found the issue of child access dispositive, did not reach these issues. The toxicity of the soil and the appropriate remedy, however, are scientific and technical questions which courts are ill-equipped to resolve. The record before the Bankruptcy Court included affidavits from a toxicologist and an environmental engineer who had been involved in creating the RAP. It also contained an affidavit from an expert hired by Revere. Revere's and Fairchild's experts offer conflicting accounts of the reasonableness, evaluated under the methodologies prevalent in the late 1980s, of the DHS determinations regarding toxicity and appropriate remedy. "In the face of conflicting evidence at the frontiers of science, courts' deference to expert determinations should be at its greatest." *Cellular Phone Taskforce,* 205 F.3d at 90.

Undoubtedly, the level of copper and zinc contamination deemed "safe" according to DHS regulations might be criticized as excessively conservative, and might not represent the currently-accepted wisdom regarding environmental hazard assessment. However, a decision consistent with a policy of making conservative assumptions in the face of scientific uncertainty cannot be characterized as either arbitrary or capricious. Similarly, the choice of the permanent remedy of excavation and removal of the contaminated soil was consistent with administrative guidelines. Of the seven remedial alternatives considered (including no remedial action), excavation and removal was cheaper than three, and was apparently selected because it scored the highest according to a protocol whose criteria, appropriately, included measures of effectiveness as well as cost. This Court is not equipped or empowered to dissect this elaborate protocol to discover whether or how it might have been improved upon. The agency adopted a Plan which appears to have followed the indicated protocol, and thus did not act arbitrarily or capriciously.

Reviewing a decision of a state environmental agency, many years after the fact, without the benefit of specific agency findings or the participation of the agency itself in the review proceeding, is a difficult and delicate process. A court undertaking such review is not asked to decide whether it would have made the same decision, or whether, with the benefit of hindsight, another course of action might have been more reasonable. Rather, its task is to decide whether the decision was within the bounds of reasonableness. For the reasons stated above, this Court cannot conclude that the agency's decision, on a subject at the heart of its specialized expertise, was outside those bounds.

## CONCLUSION

The judgment of the Bankruptcy Court is reversed and remanded for proceedings consistent with this opinion.

SO ORDERED.