OPINION OF THE COURT
Chief Judge Wachtler.
In the early 1980’s respondent Con-Agg Recycling Corp. (Con-Agg) began operating a concrete recycling business on a site in The Bronx owned by the City of New York (the City). The applicable urban renewal plan, however, did not authorize the use of the site for this purpose. Thus in 1984 Con-Agg sought amendment of the plan to allow for its recycling activities. It also sought to purchase the site from the City. Respondent Board of Estimate is the entity within the City government that was principally responsible for amending the urban renewal plan and selling the site.[1]
These proposed actions were subject to environmental review under the State Environmental Quality Review Act *679 (SEQRA) (ECL art 8). In New York City, SEQRA is implemented pursuant to the dictates of Mayoral Executive Order No. 91. Under this Executive Order two City agencies — the City Department of Environmental Protection (DEP), and the Department of City Planning — are designated as permanent "lead agencies” responsible for implementation of SEQRA. These agencies divide the environmental review of proposals according to their respective areas of expertise.
DEP reviewed the proposals in this case, and issued a "conditional negative declaration,” concluding that if certain noise abatement steps were taken by Con-Agg there would be no significant effect on the environment emanating from its recycling activities. The Board of Estimate subsequently approved the sale of the site to Con-Agg and the amendment of the urban development plan to allow for recycling on the property.
The present article 78 proceeding was then commenced against respondents[2] by The Coca-Cola Bottling Company of New York, Inc. (Coca-Cola), a neighbor of Con-Agg’s in The Bronx. It was argued, among other things, that SEQRA was violated because the Board of Estimate, and not DEP, was the agency responsible for implementing the statute in this case. The trial court agreed, granted the petition, and nullified the Board of Estimate’s actions. The Appellate Division affirmed. We also affirm.
I
SEQRA’s fundamental policy is to inject environmental considerations directly into governmental decision making; thus the statute mandates that "[s]ocial, economic, and environmental factors shall be considered together in reaching decisions on proposed activities” (ECL 8-0103 [7]; see, Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 415; Governor’s Mem, 1975 NY Legis Ann, at 438). This policy is not mere exhortation. The statute and its implementing regulations make elaborate provision for requiring consideration of the environmental effects of governmental decisions by the decision maker, primarily through the "lead agency” concept.
*680 Under SEQRA and its implementing regulations, a lead agency is defined as the governmental entity "principally responsible for carrying out, funding or approving” the proposed action (ECL 8-0111 [6]; 6 NYCRR 617.2 [v]). It is this agency that must initially determine whether a proposed action may have a significant effect on the environment (ECL 8-0109 [2], [4]; 6 NYCRR 617.2 [v]). If no significant effect is found, the lead agency may issue a "negative declaration,” identifying areas of environmental concern, and providing a reasoned elaboration explaining why the proposed action will not significantly affect the environment (6 NYCRR 617.6 [g]; see, Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 364).[3] The regulations also provide for a "conditioned negative declaration”, whereby the lead agency requires modification of a proposed action alleviating potential significant environmental effects (6 NYCRR 617.2 [h]).
If the lead agency determines that there may be significant environmental impact, it must see to it that an environmental impact statement (EIS) is prepared, which fully evaluates the potential environmental effects, assesses mitigation measures, and considers alternatives to the proposed action (ECL 8-0109 [4], [2]). When there is a decision to proceed with a proposed action for which an EIS has been prepared, the lead agency must make "an explicit finding that * * * consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided” (ECL 8-0109 [8]).
In the case now before us, Coca-Cola primarily argues that under SEQRA the Board of Estimate was the lead agency, so that it, and not DEP, was required to assess the significance of the environmental impact of the project. This error, Coca-Cola asserts, renders the Board of Estimate’s actions void. In rejoinder, respondents recognize that the statute specifically requires that the "lead agency” with principal responsibility for approving a proposed action also be the body which determines whether the action "may have a significant effect on the environment” (see, ECL 8-0111 [6]). They maintain, however, that SEQRA was not violated here, and essentially make *681 two supporting arguments, the first factual, and the second based upon statutory construction.
Respondents initially contend that Coca-Cola’s claim of a SEQRA violation lacks a factual basis, because here the DEP did not issue the conditional negative declaration itself, but only served as an advisor to the Board of Estimate on environmental matters. Thus, respondents conclude, the determination whether the project threatened significant environmental consequences was made by the appropriate agency under SEQRA.
The trial court, however, made a factual determination that the final decision to issue the conditional negative declaration was made by DEP. The Appellate Division affirmed the trial court’s order, without opinion. This finding, which respondents continue to dispute, is supported in the record before us, and therefore is beyond our further review (see, People ex rel. Scarpetta v Spence-Chapin Adoption Serv., 28 NY2d 185, 189; Cohen and Karger, Powers of the New York Court of Appeals § 108, at 452 [rev ed]).
In the alternative, respondents contend that SEQRA anticipates that municipalities will develop their own SEQRA procedures, tailored to their particular needs. They cite ECL 8-0107 and 8-0113 (3) (b), which direct that agencies should carry out SEQRA as efficiently as possible, consistent with the statute’s policy. Reliance is also placed on ECL 8-0113 (3) (a), which allows retention of existing agency procedures at least as protective of SEQRA’s policies as the statute and regulations, and which states that an agency’s variance "in form alone” from procedures required by SEQRA shall not be objectionable. Respondents argue that Executive Order No. 91 efficiently and adequately carries out SEQRA’s mandates by designating permanent lead agencies, who bring expertise, consistency and manageability to the SEQRA process. Consequently, they conclude, although SEQRA requires that the lead agency with primary responsibility for the project initially assess the project’s environmental effect, Executive Order No. 91’s scheme is a welcome and permissible variance of this requirement in form alone.
In the case now before us, however, the operation of Executive Order No. 91 transgressed SEQRA’s spirit, as well as its form. SEQRA’s core policy of injecting environmental considerations directly into the policy-making decisions of governmental entities is fully implicated. The City’s implementation *682 of the statute here allowed the Board of Estimate — the governmental entity responsible for the final policy decision to proceed with a project — to be insulated from consideration of environmental factors. This violated a fundamental policy of SEQRA.
Respondents contend, however, that in this particular case there was no SEQRA violation, because there were no environmental factors for the Board of Estimate to consider. They reason that because DEP concluded that the project would not significantly affect the environment, if certain precautions were taken by Con-Agg, Board of Estimate review was redundant and unnecessary. Respondents, therefore, assert that the SEQRA policy of having the ultimate decision maker assess environmental effects was not affected here.
As respondents would have it, the statutorily required early determination of whether a project may have a significant environmental effect is a sterile objective assessment of data, which can be separated from the policy decision involved in approving a project. However, the question of significance is not arrived at solely by gathering data and making calculations; instead, it is ultimately a policy decision, governed by the rule of reasonableness, that the particular facts and circumstances of a project do or do not call for preparation of a full impact statement (see, Chinese Staff & Workers Assn. v City of New York, supra [requiring consideration of socioeconomic factors as part of the determination of the significance of environmental effects]). Moreover, oftentimes this decision is a critical factor determining whether the project will finally be implemented. The statute’s policy, therefore, as well as its language, is transgressed when the initial determination of the significance of the environmental effect of a project is removed from the ambit of the agency principally responsible for approving the proposal.
To be sure, the lead agency under SEQRA is likely to be nonexpert in environmental matters, and will often need to draw on others. The statute and regulations not only provide for this, but strongly encourage it (see, ECL 8-0109 [3]; 6 NYCRR 617.3 [i]; 6 NYCRR 617.4 [c]). Of particular interest here, the regulations specifically advise agencies to "seek the advice and assistance of other agencies” regarding "recommendations on the significance or nonsignificance of actions” (6 NYCRR 617.4 [c] [2]). Nevertheless, the final determination on this issue must remain with the lead agency principally *683 responsible for approving the project. To the extent Mayoral Executive Order No. 91 altered or diminished that responsibility it was invalidly applied in this case, and the lower courts correctly annulled the affected resolutions of the Board of Estimate.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Judges Simons, Kaye, Alexander, Hancock, Jr., and Bellacosa concur; Judge Titone taking no part.
Order affirmed, with costs.

. Specifically, amendment of the plan and the sale of the site required Board of Estimate approval under section 505 of the General Municipal Law, and section 384 of the New York City Charter. It also required Board of Estimate review under the Uniform Land Use Review Procedure set forth in section 197-c of the City Charter, along with review, under section 200 of the City Charter, of the issuance of a special permit by the City Planning Commission under section 74-68 of the New York City Zoning Resolution.

. Respondents are the Board of Estimate of the City of New York, the City Planning Commission of the City of New York, the Department of City Planning for the City of New York, the Department of Environmental Protection of the City of New York, the Public Development Corporation of the City of New York, and Con-Agg.

. "Type II” actions genetically have been determined not to have a significant effect on the environment (6 NYCRR 617.13 [a]). Generally, under the regulations, negative declarations do not have to be issued for this category of actions (6 NYCRR 617.2 [y]; 617.3 [j]; 617.6 [g]). Respondents do not contend that the project at issue here is a Type II action.