In the Matter of RIVERKEEPER, INC., Appellant, v PLANNING BOARD OF TOWN OF SOUTHEAST et al., Respondents. (Proceeding No. 1.) In the Matter of RICHARD FEUERMAN et al., Appellants, v PLANNING BOARD OF TOWN OF SOUTHEAST et al., Respondents. (Proceeding No. 2.) In the Matter of CROTON WATERSHED CLEAN WATER COALITION, INC., et al., Appellants, v PLANNING BOARD OF TOWN OF SOUTHEAST et al., Respondents. (Proceeding No. 3.) [820 NYS2d 113]—

In three related proceedings pursuant to CPLR article 78 to review a determination of the Planning Board of the Town of Southeast, dated April 14, 2003, which, after a hearing, declined to require the preparation of a supplemental environmental impact statement in connection with the final conditional approval of a subdivision plat, the petitioner in proceeding No. 1, Riverkeeper, Inc., appeals from a judgment of the Supreme Court, Westchester County (Nicolai, J.), dated December 2, 2003, which denied its petition and dismissed proceeding No. 1, the petitioners in proceeding No. 2, Richard Feuerman, George Yourke, Gertrude Yourke, and Concerned Residents of Southeast, Inc., separately appeal from a judgment of the same court, also dated December 2, 2003, which denied their petition and

dismissed proceeding No. 2, and the petitioners in proceeding No. 3, Croton Watershed Clean Water Coalition, Inc., Putnam County Coalition to Preserve Open Space, Inc., and Cherie Ingraham, separately appeal from a decision of the same court dated October 31, 2003, and a judgment of the same court dated December 2, 2003, which, upon the decision, denied their petition and dismissed proceeding No. 3. Justice Mastro has been substituted for former Justice Cozier (see 22 NYCRR 670.1 [c]).

Ordered that the appeal from the decision is dismissed, without costs or disbursements, as no appeal lies from a decision (see Schicchi v J.A. Green Constr. Corp., 100 AD2d 509 [1984]); and it is further,

Ordered that the judgments are reversed, on the law, without costs or disbursements, the petitions are granted, the determinations are annulled, and the matters are remitted to the Planning Board of the Town of Southeast for the preparation and circulation of a supplemental environmental impact statement in accordance herewith.

In connection with the 1988 application of Glickenhaus-Brewster Development, Inc. (hereinafter the developer), for approval of a residential subdivision in the Town of Southeast, the Planning Board of the Town of Southeast (hereinafter the Planning Board) declared itself lead agency in 1989 for the purpose of environmental review pursuant to the State Environmental Quality Review Act (ECL art 8, hereinafter SEQRA). In February 1991 the Planning Board approved a final environmental impact statement (hereinafter FEIS) and an initial supplemental environmental impact statement (hereinafter the initial SEIS), and issued a statement of SEQRA findings, pursuant to which it deferred the analysis of stormwater pollution and runoff impacts from the subdivision, as well as analysis of impacts to wetlands located on the project site, which is located in the watershed of the City of New York, and contains a stream that ultimately flows into the Muscoot Reservoir, one of New York City's drinking water reservoirs.

In 1997 the New York City Department of Environmental Protection (hereinafter NYCDEP) was granted authority over the approval of applications for stormwater pollution protection plans, sewage treatment plants, and subsurface sewage disposal systems for subdivisions located within the New York City watershed (see 15 RCNY 18-11 to 18-91).

By September 1998 the Planning Board had approved four other subdivisions which either bordered the project site, or were located nearby, totaling 68 lots for single-family homes. On September 21, 1998, the United States Army Corps of Engineers

(hereinafter ACOE) and the Conservation Commission of the Town of Southeast (hereinafter CC) determined that there were 79.59 acres of wetlands on the site, rather than the 71.8 acres reported in the FEIS and the initial SEIS. In June 2000, the New York State Department of Environmental Conservation (hereinafter NYSDEC) promulgated a regulation that tightened the restrictions on the discharge of phosphorus into surface and groundwaters within the New York City watershed, a regulation that was approved by the United States Environmental Protection Agency (hereinafter EPA) in October 2000 (*see Natural Resources Defense Council, Inc. v Muszynski*, 268 F3d 91, 95 n 1 [2001]). Also in 2000, NYSDEC designated the Muscoot Reservoir as a priority waterbody, and mandated reductions in all pollutant discharges into it. In April 2001, NYCDEP and NYSDEC promulgated a phosphorus discharge reduction plan that directed the Town of Southeast to be responsible for five percent of the entire reduction of phosphorus discharges into the Muscoot Reservoir. On December 5, 2001, Governor Pataki designated all watercourses and groundwater within watershed lands east of the Hudson River, which included the project site, as "Critical Resource Waters," a designation approved by the ACOE on February 19, 2002. Among other things, that designation imposed a new obligation upon the developer to apply to the ACOE for approval of an individual wetlands permit in connection with the subdivision.

On or about October 24, 2001, the developer applied for final subdivision approval, submitting a plat that reduced the number of building lots from 139 to 104, and slightly reduced the acreage of natural wetlands on the site that would be disturbed or destroyed during construction, but which reconfigured several interior and access roads serving the site so as to require at least one road to cross a newly-identified watercourse. The developer also proposed 11 additional stormwater detention basins. In April and June 2002, the Planning Board received and considered two engineering reports from its own consultant, both of which indicated that more information on stormwater drainage and final roadway layout was required.

While the developer's applications to the ACOE, NYSDEC, NYCDEP, and the CC for water supply, water quality, wastewater discharge, and wetlands permits and approvals were pending, the Planning Board granted final conditional subdivision approval on June 10, 2002.

Thereafter, the petitioners in the instant proceedings brought two (previous) article 78 proceedings seeking to review the final conditional subdivision approval, and to compel the Planning

Board to prepare and circulate a second supplemental environmental impact statement (hereinafter SEIS), which analyzed the impacts arising from the modifications to the project and the impact that the modified project would have on the environment in light of new development in the vicinity of the project site and the change in both the applicable regulations and the regulatory environment. The Supreme Court annulled the final conditional subdivision approval, and remitted the matter to the Planning Board, for the latter to take a "hard look" at eight recently-identified or recently-created areas of environmental concern, including the ACOE's 1998 delineation expanding the extent of wetlands on the site, NYSDEC's 2000 designation of the Muscoot Reservoir as "water quality limited," NYSDEC and NYCDEP's 2001 phosphorus discharge restrictions, the 2001-2002 placement of the site within a Critical Resource Water area, NYCDEP's flagging of watercourses on the site that were not depicted on prior plans, the realignment of and changes to roadways which might affect or cross wetlands, buffer zones, or watercourses, the modification to the design of stormwater and sewage disposal systems, the impact of nearby developments on the availability of groundwater supply, and the designation, by the Town of Southeast, of the stream traversing the site as a special flood hazard area.

Based on the advice of counsel, who concluded that the Planning Board had indeed taken a hard look at those issues, and suggested that the Planning Board's error was in merely failing to make a written recitation to that effect, the Planning Board, by resolution dated April 14, 2003, decided that it did in fact take the requisite hard look, and that it was not required to prepare a second SEIS. The petitioners commenced the three instant proceedings against the Planning Board and the developer, seeking to review the resolution. The Supreme Court denied all three petitions, and dismissed the proceedings. We reverse and remit the matters to the Planning Board to prepare a SEIS that analyzes the areas of environmental concern identified above.

The record reveals that potential environmental impacts, particularly regarding water use, water quality, the protection of wetlands, and the integrity of the New York City watershed, have changed in the more than 12 years since the FEIS and initial SEIS were submitted in connection with the original subdivision plat. Moreover, the changes to the regulatory environment, as described above, underscore the need to re-evaluate the project to assure its harmony with the new regulatory scheme. Under these circumstances, the Planning Board

could not have met its obligation under SEQRA without requiring a SEIS to analyze the current subdivision plat in light of the change in circumstances since 1991 (*see* 6 NYCRR 617.9 [a] [7]; *Matter of Doremus v Town of Oyster Bay*, 274 AD2d 390, 393-394 [2000]; *cf. Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 429-430 [1986]).

We further note that the FEIS and initial SEIS were inadequate, insofar as they simply deferred analysis of critical issues concerning wetlands, the integrity of the watershed, control of phosphorus pollution, stormwater runoff, and sewage disposal, to other involved agencies that were responsible for the issuance of numerous permits. While a lead agency may solicit technical information and suggestions from involved agencies that are more expert in particular scientific areas than it is, a lead agency must coordinate environmental review with those agencies, and may not decline to undertake review of environmental remediation measures simply because another involved agency will address it in its own permit application proceedings (*see Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd.*, 253 AD2d 342, 349-350 [1999]; *Matter of Price v Common Council of City of Buffalo*, 3 Misc 3d 625, 629 [2004]; *Town of Red Hook v Dutchess County Resource Recovery Agency*, 146 Misc 2d 723, 728 [1990]; *see also Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.*, 72 NY2d 674, 681 [1988]; *Purchase Envtl. Protective Assn. v Strati*, 163 AD2d 596, 597-598 [1990]).

In this connection, we note, as an example, the following. By the time of the determination in these proceedings, the ACOE still had not yet approved a wetlands permit for the subject development. As of that date, there were significant objections to issuance of that permit pending before the ACOE. About one month before the Planning Board's determination, by letter dated March 3, 2003, EPA wrote to the ACOE, concluding that the developer had not "adequately minimized wetland fill," and objecting to issuance of the required wetlands permit. By letter dated March 18, 2003, the United States Department of the Interior, Fish and Wildlife Service (hereinafter FWS), sent an extensive letter to the ACOE, also objecting to the issuance of a wetlands permit. Among other things, the FWS was concerned about the impacts to wetlands due to the developer's proposed location of a certain road. In addition, the FWS referred to the developer's stated purpose of building a subdivision within convenient commuting distance of New York City; however, the FWS noted that the relevant distance was not defined, and the FWS presumed that other sites were available which would

"result in less impact to the aquatic environment." The FWS stated that the developer "must conduct a reasonable alternatives analysis in order to identify the least damaging alternative. We suggest that the applicant re-examine the site design and eliminate wetland impacts or select a site which would result in fewer impacts to aquatic resources." NYCDEP also had reservations, and communicated them to the Planning Board in a letter dated March 18, 2003. Among other things, NYCDEP urged the developer to reconsider the realignment of a certain crossing in order to avoid impacts on the affected wetlands, and to examine alternatives to other crossings. Further, NYCDEP recommended careful analysis of the developer's proposed "on-site mitigation" measures, noting that impacts due to the construction of such measures could outweigh any potential benefits, and that construction of those measures would replace the area, rather than the function, of the impacted wetlands.

We agree with the proposition that a lead agency frequently will lack the know-how necessary to make the often difficult and technically arcane assessments that SEQRA requires, and that it properly may defer to the expertise of private consultants, as well as other involved agencies, in fulfilling its responsibilities under SEQRA (see *Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.*, 72 NY2d 674, 682 [1988]; *Matter of Ecumenical Task Force of Niagara Frontier v Love Canal Area Revitalization Agency*, 179 AD2d 261, 268 [1992]). At bar, the Planning Board could properly defer to the ACOE and other involved agencies while they went through their particular permit application processes. But the Planning Board made an environmentally significant determination before those processes ran their course, and in the face of an appreciable probability, for example, that the ACOE would not issue a wetlands permit absent revisions to the subject project. By deferring to the ACOE, the Planning Board in this case failed to take the requisite "hard look" at the wetland issues presented (see *Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd.*, 253 AD2d 342 [1999]).

The Planning Board, as lead agency in the instant dispute, did not solicit comments from the ACOE, NYSDEC, or NYCDEP in connection with its decision to forego preparation of a SEIS. Because the ACOE and NYCDEP only became "involved agencies" after 1991 (6 NYCRR 617.2 [s]), the Planning Board must, upon remittal, coordinate its ongoing environmental review with those agencies (see 6 NYCRR 617.2 [s]; 617.6 [b] [3]).

In light of the foregoing, we do not reach the parties' remain-

ing contentions, which either have been rendered academic or are without merit. Miller, J.P., Ritter and Mastro, JJ., concur.

Spolzino, J., concurs in part and dissents in part and votes to dismiss the appeal from the decision and to affirm the judgments, with the following memorandum: I have a somewhat different view of the record than my colleagues. As I see it, the Planning Board took the requisite hard look at the areas of environmental concern identified by the Supreme Court in its prior determination and, based upon that review, rationally determined on the basis of substantial evidence in the record that no supplemental environmental impact statement (hereinafter SEIS) was necessary pursuant to the State Environmental Quality Review Act (ECL art 8, hereinafter SEQRA). I would therefore affirm the judgments of the Supreme Court denying the petitions and dismissing the proceedings.

The petitioners contend that an additional SEIS is required for, essentially, three reasons. First, they argue, the Planning Board failed to take the requisite hard look at the environmental consequences of certain changes proposed to the project since the initial SEIS was approved in 1991. Specifically, they claim that the realignment of certain roads within the development and the addition of stormwater detention ponds required additional analysis. Second, the petitioners assert that the Planning Board failed to take a hard look at new environmental information that came to light during that time period, which, they assert, bears significantly on the impact of the project. Claims in this category include the identification of additional wetlands and watercourses, the impacts of additional development nearby, and the stormwater problems demonstrated by Hurricane Floyd in 1999. Third, the petitioners contend that the Planning Board did not sufficiently take into account the changes in the regulatory environment since the project first underwent environmental review, including the adoption of new phosphorus loading standards in the New York City watershed and the designation of the entire area in which the project is located as a "Critical Resource Water."

The standard by which we are required to review the Planning Board's compliance is not unfamiliar. "Judicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination 'was affected by an error of law or was arbitrary and capricious or an abuse of discretion' (CPLR 7803 [3] . . .)" (*Akpan v Koch*, 75 NY2d 561, 570 [1990]). The choices an agency makes pursuant SEQRA may not be second-guessed by the courts, and "can be annulled

only if arbitrary, capricious or unsupported by substantial evidence" (*Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417 [1986]).

The regulations promulgated by the New York State Department of Environmental Conservation (hereinafter NYSDEC), implementing SEQRA for all state and local agencies, provide that the lead agency "may require" a SEIS, "limited to the specific significant adverse environmental impacts not addressed or inadequately addressed in the EIS that arise from: (a) changes proposed for the project; (b) newly discovered information; or (c) a change in circumstances related to the project" (6 NYCRR 617.9 [a] [7] [i]). Additionally, where the decision to require preparation of a SEIS is made on the basis of newly discovered information, the decision "must be based" upon "(a) the importance and relevance of the information; and (b) the present state of the information in the EIS" (6 NYCRR 617.9 [a] [7] [ii]). Basically, a SEIS is required where there are environmentally significant changes after the FEIS (*see Matter of Jackson v New York State Urban Dev. Corp., supra* at 430; *Matter of Village of Pelham v City of Mount Vernon Indus. Dev. Agency*, 302 AD2d 399, 400 [2003]).

The proposed modifications to the project which are alleged to be environmentally significant consist of the reconfiguration of an internal roadway so as to cross the Holly Stream, which traverses the project site, and an increase in the number of retention ponds on the site, which also serve as water quality basins. In determining that the road reconfiguration required no further analysis, however, the Planning Board considered detailed, updated reports from an engineer and an environmental consultant. These experts, who had previously presented their findings to the NYSDEC, the New York City Department of Environmental Protection (hereinafter NYCDEP) and the Army Corps of Engineers (hereinafter ACOE), concluded that the road realignment actually reduced the total aggregate length of internal roadways on the site and did not otherwise present any significant adverse environmental impact to the stream and its drainage areas that had not already been reviewed by the Planning Board. Similarly, these experts concluded that the proposed increase in the number of retention ponds would have little or no adverse impact on wetlands, surface water, groundwater, or the New York City reservoir system. These reports also found that other proposed modifications to the project, which included a reduction in the daily volume of wastewater discharges as a result of the reduced lot count, mitigated rather than exacerbated environmental impacts. There is no evidence to the contrary in the record.

The reports that the Planning Board considered provide, in my view, sufficient support in the record for the Planning Board's determination that the proposed modifications to the project were not environmentally significant (see *Matter of Halperin v City of New Rochelle*, 24 AD3d 768, 777 [2005]; *Matter of Village of Pelham v City of Mount Vernon Indus. Dev. Agency, supra*). At most, the petitioners have drawn from the data in the record an inference different than that drawn by the Planning Board as to whether the proposed modifications to the project present significant adverse environmental impacts. Because scientific unanimity need not be achieved, these differing inferences, standing alone, constitute an insufficient basis upon which to annul the Planning Board's determination (see *Roosevelt Islanders for Responsible Southtown Dev. v Roosevelt Is. Operating Corp.*, 291 AD2d 40, 57 [2001]; *Matter of Argyle Conservation League v Town of Argyle*, 223 AD2d 796, 798 [1996]; *Sun Co. v City of Syracuse Indus. Dev. Agency*, 209 AD2d 34, 51 [1995]; *Matter of Schodack Concerned Citizens v Town Bd. of Town of Schodack*, 148 AD2d 130, 134 [1989]; *Ellis v Marsh*, 164 Misc 2d 135, 142 [1995]).

There is also ample support in the record, in my view, for the Planning Board's determination that the new environmental information which came to light since the initial environmental review process was completed does not require a second SEIS. The petitioners argue in this regard that the Planning Board's initial delineation of the extent of wetlands on the site was placed in doubt by the determinations of the ACOE and the Town's Conservation Commission, made after the SEIS, that there were seven more acres of wetlands on the site than had originally been reported. In response to these criticisms, the Planning Board retained the same wetlands expert who had recently surveyed the site and prepared a report for the Conservation Commission, and directed him to revisit the site in order to redelineate the wetlands on the site and recharacterize them, if necessary. The Planning Board reviewed the expert's reports, which noted that the additional wetlands acreage identified by the ACOE and the Conservation Commission was to remain undisturbed. The wetlands expert, mirroring the conclusions of the engineer and the environmental consultant, concluded that the modified project would disrupt less wetland acreage than the initial proposal. Moreover, when the developer applied on May 3, 2002, for a town permit to affect 1.26 acres of wetland on the site, of which 1.08 acres were proposed to be disturbed, of which, in turn, 0.99 acres were proposed to be filled, it also proposed to create 3.2 acres of artificial wetlands to mitigate the impacts arising from the loss of existing wetlands. The wetlands

expert opined that the creation of the artificial wetlands more than mitigated the loss of the natural wetlands. The Planning Board credited the analyses of the engineer, environmental consultant, and wetlands expert, which were the only analyses included in the record.

"The purpose of a SEIS is to account for new information bearing on matters of environmental concern not available at the time of the original environmental review" (*Matter of Coalition Against Lincoln W., Inc. v Weinshall*, 21 AD3d 215, 223 [2005]). Based on the present state of the FEIS, the initial SEIS, and the SEQRA findings, I cannot conclude that the "new" wetlands delineations undertaken by the ACOE and the Conservation Commission presented the Planning Board with an issue of significant environmental concern (*see Matter of Sour Mtn. Realty v New York State Dept. of Envtl. Conservation*, 260 AD2d 920 [1999]; *Matter of Hallenbeck v Onondaga County Resource Recovery Agency*, 225 AD2d 1036, 1036-1037 [1996]), particularly since the newly-defined wetlands acreage was to remain undisturbed. Moreover, any discrepancy is easily explained by the fact that different experts not uncommonly make differing wetlands delineations even when they apply the same technical criteria, and there are differing conditions obtaining at any given wetland site during the course of different inspections (*see Matter of Seven Acre Wood St. Assoc. v Town of Bedford*, 302 AD2d 532 [2003]). Nor have the environmental conditions at the site itself so changed since the issuance of the initial SEIS in 1991 that a second SEIS is necessary to take account of such changes (*see Matter of Molly, Inc. v County of Onondaga*, 2 AD3d 1418, 1419 [2003]).

The petitioners next contend that there have been significant changes in the regulatory environment since the initial SEIS was approved that require additional environmental review with respect to this project. Three such regulatory changes are in issue. In 1997, NYCDEP was granted authority to approve or disapprove the stormwater pollution control plans and subsurface disposal systems of subdivisions located on lands within the New York City Watershed (*see* 15 RCNY 18.11, 18.91 and Appendices A-D). In 2000, NYSDEC promulgated new regulations limiting the discharge of phosphorus and phosphates in order to reduce the level of those substances in the nearby reservoirs. In 2002, the region in which the site is located was designated a Critical Resource Water area. Although these are significant regulatory changes, I see no merit to the petitioners' contention that they require a second SEIS. As I see it, the documents considered by the Planning Board, generated both before and

after these regulatory changes, addressed all of the environmental issues raised by the regulatory changes. Thus, in my view, the Planning Board rationally determined that the new regulatory overlay did nothing to affect the actual environmental impact of the project.

In its 1991 SEQRA findings, the Planning Board concluded that intensive surface water quality investigations had determined that the proposed development would not degrade the quality of on-site or adjacent surface waters. The Planning Board also found that the wastewater treatment facility proposed for the site would utilize advanced treatment methods, resulting in the discharge of water not only in compliance with applicable water quality standards, but exceeding them. The water quality investigation found that further treatment of the effluent would render it completely free of phosphorus, and that the subsurface wastewater disposal system proposed for the site would neither degrade the quality of Holly Stream, nor result in the discharge of any phosphorus which could end up in a New York City reservoir. No party challenged these findings at the time. When, almost six years later, NYCDEP became an involved agency for SEQRA purposes as a result of its new regulatory authority, the environmental and engineering reports submitted to it concluded that the anticipated impacts of the project would be no different than those that had been analyzed in the DEIS, FEIS, and the initial SEIS, and described in the SEQRA findings. The only "change" was that an agency other than the Planning Board would have the final say over the details of the pollution control plan and the treatment plant. There is nothing in the record to controvert this conclusion.

Similarly, when, on May 21, 2002, the Army Corps confirmed the designation of the region in which the site was located as a "Critical Resource Waters" area, the only "change" that occurred was that the project was removed from the coverage of a nationwide general permit for the filling of wetlands (see 33 USC § 1344 [e]; 33 CFR 330.2 [b]; 65 Fed Reg 12818, 12874 [2000]; see also 67 Fed Reg 2020, 2071 [2002]; 66 Fed Reg 42070, 42098 [2001]), and the ACOE became an involved agency with authority to approve or deny an individual wetlands fill permit pursuant to the federal Clean Water Act (see 33 USC § 1344 [a]). After this designation, the developer, based on the modified proposal contained in its permit application to the town Conservation Commission, duly applied to the ACOE to convert its February 2001 application for inclusion in the nationwide permit program into an application for the requisite individual permit from the ACOE. As with NYCDEP's newly-granted

authority, there was nothing in the additional permitting authority granted to the ACOE which presented a significant adverse change in the physical circumstances of the project, or the actual physical impacts that would be reviewed.

The record thus does not, in my opinion, reflect any significant adverse environmental impacts left unaddressed in the FEIS, the initial SEIS, or the 1991 SEQRA findings. To the extent any impacts arising from project modifications were revealed between 1997, when NYCDEP became an involved agency, and 2003, when the Planning Board made the determination under review, the record supports the Planning Board's conclusion that those impacts were negligible. In the absence of any such proof, my colleagues' determination to the contrary constitutes, in my view, the "second-guessing" of the Planning Board that we are forbidden to do (*Matter of Jackson v New York State Urban Dev. Corp., supra* at 429-430; *see Matter of Halperin v City of New Rochelle, supra; Matter of Coalition Against Lincoln W. v Weinshall, Inc., supra* at 223; *Matter of Town of Pleasant Val. v Town of Poughkeepsie Planning Bd.,* 289 AD2d 583 [2001]; *Matter of Village of Hudson Falls v New York State Dept. of Envtl. Conservation,* 158 AD2d 24, 32 [1990], *affd* 77 NY2d 983 [1991]).

Finally, I believe that there is no support for the majority's conclusion that the Planning Board unlawfully delegated its environmental review functions to other regulatory agencies. " 'A lead agency . . . may rely upon the advice it receives from others, including consultants, if reliance is reasonable' (*Matter of Stewart Park & Reserve Coalition v New York State Dept. of Transp.,* 157 AD2d 1, 7 [1990], *affd* 77 NY2d 970 [1991]; *see Akpan v Koch,* 75 NY2d 561, 575 [1990]; *Sun Co. v City of Syracuse Indus. Dev. Agency,* 209 AD2d 34, 51 [1995]; *Matter of Ecumenical Task Force of Niagara Frontier v Love Canal Area Revitalization Agency,* 179 AD2d 261, 268 [1992]). Lead agencies are 'likely to be nonexpert in environmental matters, and will often need to draw on others' (*Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.,* 72 NY2d 674, 682 [1988]). SEQRA and its implementing regulations not only provide for this, but strongly encourage it (*see* ECL 8-0109 [3]; 6 NYCRR 617.3 [i]; former 6 NYCRR 617.4 [c]; *Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., supra* at 682)" (*Matter of Halperin v City of New Rochelle,* 24 AD3d at 774-775, *supra*). "Of particular interest here, the regulations specifically advise agencies to 'seek the advice and assistance of other agencies' regarding 'recommendations of the significance or nonsignificance of actions' (6 NYCRR 617.4 [c]

[2])" (*Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.*, 72 NY2d 674, 682 [1988]; *see Matter of Ecumenical Task Force of Niagara Frontier v Love Canal Area Revitalization Agency*, 179 AD2d 261, 268 [1992]).

Contrary to my colleagues' conclusion, the Planning Board here did not, in my view, simply defer critical environmental review to other involved agencies, whose administrative proceedings were ongoing (*cf. Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., supra*). Rather, the Planning Board based its determination to forgo the preparation of an additional SEIS in large measure on evidence and expert opinion contained in the administrative records of those very agencies. This was entirely reasonable. Nor was there any requirement that the Planning Board notify newly-involved agencies such as the ACOE and NYCDEP that it was considering whether to prepare an additional SEIS, and there was no requirement that the Planning Board hold a public hearing in connection with that issue (*see Matter of Jackson v New York State Urban Dev. Corp., supra* at 430).

For the foregoing reasons, I believe that the Supreme Court correctly held that the determination of the Planning Board that no additional SEIS was required in connection with the instant project was supported by substantial evidence in the record and was entirely reasonable. Since I would dismiss the appeal from the decision but affirm the judgments, I respectfully dissent in part, and concur in part.