Matter of Sierra Club v Martens (2018 NY Slip Op 00153)





Matter of Sierra Club v Martens


2018 NY Slip Op 00153


Decided on January 10, 2018


Appellate Division, Second Department


Connolly, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 10, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

L. PRISCILLA HALL, J.P.
LEONARD B. AUSTIN
SANDRA L. SGROI
FRANCESCA E. CONNOLLY, JJ.


2015-02317
 (Index No. 2949/14)

[*1]In the Matter of Sierra Club, et al., appellants, 
v
Joseph Martens, Commissioner, New York State Department of Environmental Conservation, et al., respondents.



APPEAL by the petitioners, in a proceeding pursuant to CPLR article 78 to review a determination of the New York State Department of Environmental Conservation dated November 15, 2013, as amended March 7, 2014, which granted the application of the respondent Trans Canada Ravenswood, LLC, for a water withdrawal permit pursuant to Environmental Conservation Law § 15-1501(9), from a judgment of the Supreme Court (Robert J. McDonald, J.), entered December 10, 2014, in Queens County, which, upon decisions of the same court dated October 1, 2014, and October 2, 2014, respectively, denied the petition and dismissed the proceeding



Lippes & Lippes, Buffalo, NY (Richard J. Lippes of counsel), Rachel Treichler, Hammondsport, NY, Gary Abraham, Allegany, NY, and Jonathan L. Geballe, New York, NY, for appellants (one brief filed).
Eric T. Schneiderman, Attorney General, New York, NY (Anisha S. Dasgupta and Bethany A. Davis Noll of counsel), for respondent Joseph Martens, Commissioner, New York State Department of Environmental Conservation.
Barclay Damon, LLP, Albany, NY (Yvonne E. Hennessey, Danielle E. Mettler-LaFeir, and Laura L. Mona of counsel), for respondent Trans Canada Ravenswood, LLC.



CONNOLLY, J.


OPINION & ORDER
We hold that the issuance of an "initial permit" for making water withdrawals pursuant to Environmental Conservation Law § 15-1501(9) is not a ministerial act that is excluded from the definition of "action" under the State Environmental Quality Review Act (hereinafter SEQRA; see ECL 8-0105[5][ii]).
I
The respondent Trans Canada Ravenswood, LLC (hereinafter TC Ravenswood), operates the Ravenswood thermoelectric generating station (hereinafter Ravenswood Station or the station) in Long Island City, Queens, which produces energy for the City of New York. In connection with electrical generation by three of the station's four steam generators, Ravenswood Station withdraws large amounts of water from the East River to cool the station's boiler equipment, [*2]turbines, and auxiliary equipment. The water is used only once and then discharged back into the East River. This "once-through cooling" system is the original cooling system that has been used by Ravenswood Station since it began operating in 1963. The station's fourth generator uses a multi-celled air-cooled condenser system that does not require the withdrawal of water from the river. When operating at full load, the station has a maximum withdrawal capacity of 1.5 billion gallons of water per day, although the actual amount of water used to operate the station is typically less, and varies depending upon the station's operating needs. This sizable water withdrawal has environmental consequences, most notably to fish and other local aquatic life. When the cooling water is drawn in, larger fish are killed when they become "impinged" on the screens that cover the intake structures to prevent debris in the water from entering. Juvenile fish, larvae, and eggs that are small enough to pass through the intake screens are killed when they become "entrained" in the cooling system. Additionally, the discharge of heated water back into the East River also has an impact on the aquatic environment. In the early 1990s, studies by ConEdison, the station's prior owner, demonstrated that, each year, approximately 83,000 fish became impinged and an average of 220 million eggs, larvae, and juvenile fish became entrained by the station's cooling system. Technology installed at the station in 2005 reduced annual impingement to approximately 25,000 fish and entrainment to 150 million organisms and eggs. Additional measures implemented in 2012 resulted in further reductions in impingement and entrainment.
II
Since the 1970s, Ravenswood Station has been regulated by the Federal Clean Water Act (see 33 USC § 1251 et seq.), and required to maintain a State Pollutant Discharge Elimination System (hereinafter SPDES) discharge permit (see ECL 17-0801 et seq.; see also 33 USC § 1342[b]). The SPDES permitting system, which the New York State Department of Environmental Conservation (hereinafter the DEC) administers at the state level, regulates the discharge of pollutants from point sources (see 33 USC § 1311[a]). With respect to cooling water intake structures, the Clean Water Act provides that effluent standards for discharges "shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact" (33 USC § 1326[b] [emphasis added]). "Best technology available," or "BTA," is a standard of performance established through detailed regulations promulgated by the United States Environmental Protection Agency (40 CFR 125.94[a]; see Entergy Corp. v Riverkeeper, Inc., 556 US 208). The Clean Water Act expressly provides that states may adopt and enforce more stringent effluent limitations or standards of performance than required by federal law (see 33 USC § 1370; Islander E. Pipeline Co., LLC v Connecticut Dept. of Envtl. Protection, 482 F3d 79, 90 n 9 [2d Cir]).
While the SPDES permitting system generally authorized the DEC to regulate entities that discharge into water, under prior law (see former ECL 15-1501), the DEC also had separate authority to regulate withdrawals of water, i.e., the removal or taking of water from the waters of the state, but only with respect to withdrawals made by public water suppliers (see Assembly Sponsor's Mem in Support, Bill Jacket, L 2011, ch 401; see also ECL 15-1502[16]). However, the "consumptive uses of water for agricultural, commercial, and industrial purposes remain[ed] largely unregulated" (Assembly Sponsor's Mem in Support, Bill Jacket, L 2011, ch 401 [emphasis added]). Neighboring states, including "Connecticut, New Jersey, Rhode Island, and Massachusetts all ha[d] programs that regulate[d] industrial, commercial and agricultural water withdrawals" (id.; see Conn Gen Stat §§ 22a-365 to 22a-379; NJ Stat § 58:1A-1 et seq.; RI Gen Laws tit 46, ch 15.7; Mass Gen Laws ch 21G).
Accordingly, in 2011, the State Legislature amended ECL article 15 by enacting the Water Resources Protection Act (see ECL 15-1501 et seq. [hereinafter the WRPA]), which directed the DEC to implement a water withdrawal permitting program to regulate the use of the state's water resources. Pursuant to the WRPA, all commercial and industrial operators of water withdrawal systems with a capacity to withdraw more than 100,000 gallons per day are required to obtain a water withdrawal permit (see ECL 15-1501[1]; 15-1502[14]). Applicants for water withdrawal permits are required to submit a "proposed near term and long range water conservation program that incorporates environmentally sound and economically feasible water conservation measures" (ECL 15-1503[1][f]). The DEC has the power to grant or deny a permit, or to grant a permit with conditions, and in doing so, must consider a number of statutory factors, including whether "the proposed water withdrawal will be implemented in a manner to ensure it will result in no significant [*3]individual or cumulative adverse impacts on the quantity or quality of the water source and water dependent natural resources," and whether "the proposed water withdrawal will be implemented in a manner that incorporates environmentally sound and economically feasible water conservation measures" (ECL 15-1503[2][f], [g]).
As pertinent to this appeal, with respect to existing operators of water withdrawal systems, the WRPA provides for the issuance of an "initial permit" based upon an operator's self-reported "maximum water withdrawal capacity" prior to the statute's effective date (ECL 15-1501[9]). Specifically, the statute states: "[the DEC] shall issue an initial permit, subject to appropriate terms and conditions as required under this article, to any person not exempt from the permitting requirements of this section, for the maximum water withdrawal capacity reported to [the DEC] . . . on or before February [15, 2012]" (ECL 15-1501[9] [emphasis added]; see 6 NYCRR 601.7[d]). The DEC's regulations implementing the WRPA state that an "initial permit . . . includes all terms and conditions of a water withdrawal permit, including environmentally sound and economically feasible water conservation measures to promote the efficient use of supplies, and is subject to modification, suspension and revocation" (6 NYCRR 601.7[e]).
III
In order to comply with the WRPA, in 2013, TC Ravenswood applied for an initial permit. The DEC determined that the permit application was not subject to SEQRA. In response to public comments that the application should be reclassified as a Type I action under SEQRA, the DEC asserted that the issuance of the permit was ministerial, because it "has no discretion but to issue initial permits' for the amount of the water withdrawals for users that were in operation and properly reported their withdrawals to [the DEC] as of February 15, 2012." On November 15, 2013, the DEC issued TC Ravenswood an initial permit authorizing the withdrawal of 1.39 billion gallons of water per day. The initial permit incorporated monitoring requirements from TC Ravenswood's SPDES permit, and imposed several additional conditions related to the installation of meters and the collection of data regarding water withdrawals. Subsequent to the issuance of the initial permit, the DEC amended the initial permit to authorize the withdrawal of just over 1.5 billion gallons of water per day.
The petitioners, who are nonprofit organizations dedicated to the protection of the environment and conservation of water resources, commenced this proceeding pursuant to CPLR article 78, arguing that the DEC erroneously classified the issuance of the permit as a ministerial action not subject to SEQRA. The Supreme Court denied the petition and dismissed the proceeding, concluding that the WRPA and its implementing regulations did not leave the DEC with any discretion to deny TC Ravenswood an initial permit, and that it was thus required to issue the initial permit regardless of environmental concerns. The petitioners appeal, and we reverse.
IV
"In a CPLR article 78 proceeding to review a determination of an administrative agency, the standard of judicial review is whether the determination was made in violation of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion" (Matter of Wilson v New York City Dept. of Hous. Preserv. & Dev., 145 AD3d 905, 907; see CPLR 7803[3]). For the reasons that follow, we find that the issuance of an initial permit pursuant to ECL 15-1501(9) is not a ministerial act and, therefore, the DEC's determination was affected by an error of law (see CPLR 7803[3]; Matter of 149 Glen St. Corp. v Jefferson, 140 AD3d 742, 743; cf. Matter of Long Is. Pine Barrens Socy., Inc. v Central Pine Barrens Joint Planning & Policy Commn., 138 AD3d 996, 998).
"SEQRA's fundamental policy is to inject environmental considerations directly into governmental decision making; thus the statute mandates that [social], economic, and environmental factors shall be considered together in reaching decisions on proposed activities'" (Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d 674, 679, quoting ECL 8-0103[7]). "The procedures necessary to fulfill SEQRA review are carefully detailed in the statute and its implementing regulations, and [courts] have recognized the need for strict compliance with SEQRA requirements" (Matter of City Council of City of Watervliet v Town Bd. of Town of Colonie, 3 NY3d 508, 515 [citations omitted]; see Matter of King v Saratoga County Bd. of Supervisors, 89 NY2d 341, 347).
"To promote the Legislature's goals, and to provide an informational tool to aid in the decision-making process, SEQRA requires agencies to prepare an [environmental impact statement] on any action they propose or approve which may have a significant effect on the environment'" (Incorporated Vil. of Atl. Beach v Gavalas, 81 NY2d 322, 325, quoting ECL 8-0109[2]). "[SEQRA] broadly defines the term action' to include projects or activities that the agency either directly undertakes or funds, policy and procedure-making and the issuance of permits, licenses or leases" (Incorporated Vil. of Atl. Beach v Gavalas, 81 NY2d at 325 [emphasis added]; see ECL 8-0105[4]). When undertaking an action, a governmental agency (or designated "lead agency" where more than one agency is involved in the decision-making process) must initially determine whether a proposed action "may have a significant effect on the environment" (Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d at 680; see ECL 8-0109[2]; see also ECL 8-0111[6]). "If no significant effect is found, the lead agency may issue a negative declaration,' identifying areas of environmental concern, and providing a reasoned elaboration explaining why the proposed action will not significantly affect the environment" (Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d at 680; see 6 NYCRR former 617.6[g]). However, "[i]f the lead agency determines that there may be significant environmental impact, it must see to it that an environmental impact statement [hereinafter EIS] is prepared, which fully evaluates the potential environmental effects, assesses mitigation measures, and considers alternatives to the proposed action" (Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y., 72 NY2d at 680; see ECL 8-0109[2], [4]).
To assist agencies in determining whether a proposed action may have a significant effect on the environment, SEQRA directs the DEC to promulgate regulations identifying, inter alia, "[a]ctions or classes of actions that are likely to require preparation of environmental impact statements," and "[a]ctions or classes of actions which have been determined not to have a significant effect on the environment and which do not require environmental impact statements" (ECL 8-0113[2][c]). In furtherance of this mandate, the DEC classifies actions as Type I, Type II, or Unlisted (see Matter of South Bronx Unite! v New York City Indus. Dev. Agency, 115 AD3d 607, 609 n 4). "[A] Type I action carries with it the presumption that it is likely to have a significant adverse impact on the environment and may require an EIS" (6 NYCRR 617.4[a][1]). Type II "actions have been determined not to have a significant impact on the environment or are otherwise precluded from environmental review under [SEQRA]" (6 NYCRR 617.5[a]). "[A]ll remaining actions are classified as unlisted' actions" (Matter of City Council of City of Watervliet v Town Bd. of Town of Colonie, 3 NY3d at 518 n 8). "Type I and unlisted actions are subject to SEQRA review, and Type I actions are more likely to require the preparation of an EIS than Unlisted actions'" (id., quoting 6 NYCRR 617.4[a]).
As relevant to the case at bar, the DEC classifies "a project or action that would use ground or surface water in excess of 2,000,000 gallons per day" as a Type I action (6 NYCRR 617.4[b][6][ii]). Ravenswood Station has the capacity to withdraw over 1.5 billion gallons of water per day, an amount approximately 750 times greater than the DEC's Type I threshold.
However, SEQRA also expressly excludes from the definition of "action," "official acts of a ministerial nature, involving no exercise of discretion" (ECL 8-0105[5][ii]). The DEC construes the words "shall issue" in ECL 15-1501(9) to mean that the issuance of an initial permit to an existing operator is mandatory and involves no agency discretion, and is, therefore, a ministerial act. The petitioners argue that the words "subject to appropriate terms and conditions as required under this article" in ECL 15-1501(9) give the DEC the discretion to impose conditions on the initial permit and, therefore, the issuance of an initial permit is not excluded from the definition of "action" under SEQRA. We agree with the petitioners' interpretation of the statute.
Whether a particular action is ministerial or discretionary depends upon the underlying statute or regulatory scheme (see Incorporated Vil. of Atl. Beach v Gavalas, 81 NY2d at 325; Matter of Ziemba v City of Troy, 37 AD3d 68, 73). "Discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result" (Tango v Tulevech, 61 NY2d 34, 41; see Matter of Filmways Communications of Syracuse v Douglas, 106 AD2d 185, 186, affd 65 NY2d 878). Generally, determinations that involve an agency's expertise, the application of law, and exercise of judgment are nonministerial (see New York Civ. Liberties Union v State of New York, 4 NY3d 175, 184; Tango v Tulevech, 61 NY2d 34, 41; see also Tarter v State of New York, 68 NY2d 511, 518-519). "[W]hen an agency has [*4]some discretion, but that discretion is circumscribed by a narrow set of criteria which do not bear any relationship to the environmental concerns that may be raised in an EIS, its decisions will not be considered actions' for purposes of SEQRA's EIS requirements" (Incorporated Vil. of Atlantic Beach v Gavalas, 81 NY2d at 326).
Here, while ECL 15-1501(9) states that the DEC "shall issue" an initial permit to an existing operator for its self-reported maximum water withdrawal capacity, the statute provides that such initial permit is "subject to appropriate terms and conditions as required under this article." Notably, the WRPA specifically provides the DEC with the power "to grant or deny a permit or to grant a permit with conditions" (ECL 15-1503[2] [emphasis added]). The statutory factors that the DEC is required to consider when reviewing an application and imposing conditions on the permittee do not lend themselves to mechanical application. For instance, whether "the proposed water withdrawal will be implemented in a manner that incorporates environmentally sound and economically feasible water conservation measures" (ECL 15-1503[2][g]) will almost certainly vary from operator to operator, or from water source to water source. The DEC's own regulations state that an "initial permit" must include "environmentally sound and economically feasible water conservation measures to promote the efficient use of supplies" (6 NYCRR 601.7[e]). Whether a condition is "appropriate" for a given operator is a matter that falls within the DEC's expertise and involves the exercise of judgment, and, therefore, implicates matters of discretion (see New York Civ. Liberties Union v State of New York, 4 NY3d at 184; Tango v Tulevech, 61 NY2d at 41; see also Tarter v State of New York, 68 NY2d at 518-519).
While ECL 15-1501(9) may be mandatory with respect to the maximum volume of water an operator receiving an initial permit is authorized to withdraw, i.e., its pre-WRPA maximum withdrawal capacity, the statute clearly authorizes the DEC to act in a discretionary manner with respect to the imposition of "appropriate terms and conditions as required under [ECL article 15]." Thus, while the phrase "shall issue" implies a nondiscretionary act, "[s]tatutory language, however strong, must yield to what appears to be intention and that is to be found not in the words of a particular section alone but by comparing it with other parts or provisions of the general scheme of which it is part" (McKinney's Cons Laws of NY, Book 1, Statutes § 97, Comment at 213 [1971 ed]).
In light of our determination, the parties' remaining contentions have been rendered academic.
Accordingly, the initial permit, as amended, must be annulled, and the matter remitted to the DEC for further proceedings on TC Ravenswood's permit application in accordance with SEQRA. Therefore, the judgment is reversed, on the law, that branch of the petition which was to annul the determination dated November 15, 2013, as amended March 7, 2014, is granted, the petition is otherwise denied as academic, and the matter is remitted to the DEC for further proceedings in accordance herewith.
HALL, J.P., AUSTIN and SGROI, JJ., concur.
ORDERED that the judgment is reversed, on the law, with one bill of costs, that branch of the petition which was to annul the determination dated November 15, 2013, as amended March 7, 2014, is granted, the petition is otherwise denied as academic, and the matter is remitted to the New York State Department of Environmental Conservation for further proceedings in accordance herewith.
ENTER:
Aprilanne Agostino
Clerk of the Court